799 So.2d 997 (2001)
Jermaine LEBRON, Appellant,
v.
STATE of Florida, Appellee.
No. SC93955.
Supreme Court of Florida.
August 30, 2001.
Rehearing Denied November 1, 2001.
*1000 Robert A. Norgard, Bartow, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Judy Taylor Rush, Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the *1001 death penalty upon Jermaine Lebron for the 1995 murder of Larry Neal Oliver. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For reasons which follow, we affirm Lebron's convictions, but vacate his sentence of death, and remand for a new penalty phase proceeding.

I. FACTS

Guilt Phase Proceedings
Appellant, Jermaine Lebron ("Lebron") was arrested in New York City for the murder of Larry Neal Oliver. During the first trial concerning the charge, Lebron was represented by Mr. Slovis (a New York attorney, appearing pro hac vice on Lebron's behalf) and Mr. Norgard (a Florida lawyer, also representing Lebron on appeal).[1] This first trial resulted in a mistrial, based upon the trial court's finding of a jury deadlock.
At the beginning of Lebron's retrial, Norgard was involved in another capital case, and, therefore, the pretrial and guilt phase proceedings were conducted with only Slovis appearing on Lebron's behalf. During this second trial, it was established that Lebron was a major participant in the robbery and murder of the victim (who worked with one of Lebron's acquaintances, Danny Summers). Indeed, all of the eyewitnesses testified that it was Lebron (nicknamed "Bugsy") who had directed the events both before and after the victim's death, and who, using a sawed-off shotgun (which he called "Betsy"), had fatally shot the victim.
According to eyewitnesses, the victim had been lured to a house in Osceola County (the "Gardenia house") where Lebron and several others were staying after Lebron offered to sell the victim some "spinners" for his truck. Shortly after the victim arrived at the home, Lebron called to him to come toward the back bedrooms. As the victim entered the hallway leading to the bedrooms, he was forced to lie face down, and was shot at short range in the back of the head. Eyewitnesses testified that, after the victim was shot, Lebron was smiling and laughing, yelling, "I did it. I did it," and describing how it felt to kill the victim, and what it looked like. Money, checks, and a credit card were taken from the victim, and stereo equipment was stripped from his truck. Lebron directed others present at the time to burn the victim's identification papers, to dispose of the victim's body, and to clean up the area where the victim had been shot.
Over the next several days, Lebron and some of the others used the victim's credit card, pawned his stereo equipment, and cashed his checks. An attempt was also made to burn the victim's truck. During this time, Lebron admitted to his former girlfriend, Danita Sullivan, that he had shot a man, that "he had killed someone." He also told his current girlfriend, Christina Charbonier, that he had killed a man for his truck. Shortly thereafter, Lebron left for New York City, the place where "Legz Diamond," a topless juice bar owned by his mother, was located.
The victim's body was later discovered in a rural area near the Walt Disney World property. Although the body was covered with a blanket and some shrubs, it was still visible from the road.
The medical examiner, Dr. Julia Martin, performed the autopsy on Oliver's body after it was discovered. She testified that the head was badly decomposed, and that the trauma to the head, which incorporated *1002 the left portion of the lip, was consistent with a gunshot wound or other type of trauma, with no evidence of any abrasion around it. The entrance of the gunshot wound was to the right back of the head, slightly to the right of the midline and low in the back of the head. X-ray films showed the shot pellets traveling in a slightly upward fashion, right to left. There was a laceration of the scalp consistent with a shot at close or contact range. There were some bones missing from the back of the head. There were no bruises to the hands consistent with defensive wounds. The cause of death, which was instantaneous, was from a shotgun wound to the head.
After Lebron left for New York, the others having knowledge of the event reported the murder to law enforcement officers. All of the witnesses claimed that they had followed Lebron's directions throughout the unfolding events because Lebron had threatened them, and they were afraid that he might do to one of them what he had done to Oliver. Initially, two of these individuals, Joe and Mark Tocci, did not tell the complete truth concerning the extent to which members of the group had been involved in the murder. During the course of the interview, however, the witnesses, who were questioned by the officers separately, eventually recounted the events of the murder and its aftermath consistently with their testimony at trial. All of the witnesses other than the Tocci brothers gave statements which were consistent throughout, and also consistent with what the police were able to verify with evidence and other statements (such as where the body was hidden; where the truck was burned; how the checks were cashed; and where Oliver's property was pawned).
At about the same time, a crime-scene investigation was being conducted by the Osceola County Sheriffs Department. Investigators observed several drops of what appeared to be dried blood in a big area at the southeast bedroom door of the home where the event allegedly occurred. They also discovered what appeared to be blood that had some foreign substance on it. The area was at least twelve to fourteen inches in diameter. A very strong stench of dried blood was detected immediately upon entering the residence.
Plastic balls were found inside the southeast bedroom, along with sponges and pellets. A spent Winchester twelve-gauge pheasant shotgun shell was found in a drawer in another bedroom. In a third bedroom, the police found four shotgun shells and the decedent's ring in a pair of sneakers.
Shortly after these eyewitness reports were made to law enforcement, Lebron, accompanied at the time by Stacie Kirk and Howard Kendall (who was involved in burning Oliver's truck), was apprehended in a car parked on the street outside of Legz Diamond, and arrested. Incident to the arrest, a search of the vehicle was conducted, and a day planner was recovered from the center console underneath the dashboard between the passenger seat and the driver's seat. Upon opening the planner, an identifying card with the name "Larry N. Oliver" was found. Detective Rodriguez retrieved the planner and secured it for safekeeping. He also found four shotgun shells in the center console.
After searching the vehicle, Detective Rodriguez returned to the precinct offices where Lebron was being held, and was present while Detective Thompson interrogated Lebron. Prior to speaking with Lebron, Thompson read him the standard Miranda rights from two forms. Lebron was also allowed to read the forms, and he signed or initialed the forms, indicating that he understood their content.
*1003 Rodriguez and Detective Delroco from the Manhattan precinct were also present. They began questioning Lebron at approximately 3:15 in the morning. Thompson obtained Lebron's statement, and it was recorded on a microcassette. This was received into evidence, and played for the jury. In his recorded statement, Lebron told the officer that he had stayed at the Gardenia house, sleeping on the couch, or in one of the rooms. He denied being at the house on the night of the murder, claiming to have gone to his former girlfriend's house that night. He repeatedly said he did not know Oliver, although, at the end of the statement, he said "it could have happened" that he met Oliver that night, but simply did not remember the meeting. He recalled that one of the others had pawned a stereo in Orlando, and admitted having gone to Kinko's with the others (where they had initially gathered on the night of the murder). He acknowledged having seen information about the missing red truck in a flyer, and having heard Oliver's parents make an appeal on the news. When questioned about whether he had noticed any blood spot at the house, or smelled any strange odors there, he said: "It always smelled like that. We alwayseverybody said it was Mary. That's what everybody always said, it was Mary."
After he was arrested, Lebron was charged with first-degree murder and armed robbery. While in jail, Lebron wrote letters to Christina, who did not respond to them. In the letters, which were written in his own hand, Lebron stated that he loved Christina, called her his fiancee, and referred to her testifying as an alibi witness for him. About a week before trial, however, Christina went to the Osceola County Sheriff's office with the information to which she testified (as a State's witness) at trial. She stated that Lebron threatened her at that time, so she had sought advice about what she should do. She decided to testify, because she "started thinking about if anything happened to, if anything happened to my daughter I would want somebody to come forward."

Use of Special Verdict Forms at Trial
When it came time for the jury's deliberation, special verdict forms were presented to the jurors. Pursuant to these forms, the jury was to determine whether Lebron was or was not guilty of premeditated murder or felony murder, first degree (Count I). If the jury found Lebron guilty of felony murder, it was to indicate whether Lebron had a firearm in his possession at the time the offense was committed. The jury was also to determine whether Lebron was or was not guilty of robbery (Count II). If the jury found find Lebron guilty of robbery, it was to indicate whether Lebron had a firearm in his possession at the time the robbery was committed. Lastly, the jury was provided with a special verdict form which applied only if the jury found Lebron guilty of the felony murder charge, and which contained the following options: "We, the jury, having found the defendant guilty of felony first degree murder, find as follows: [Option 1] Jermaine Lebron is the person who killed Larry Neal Oliver, Jr. [Option 2] Larry Neal Oliver, Jr. was killed by a person other than Jermaine Lebron."
The jury expressed some confusion in attempting to use these forms. The jurors sent the judge the following note: "Does option # 2 mean the same as the "or" in (3) under Felony Murder-First Degree. Is this a standard document can an option be added." After consulting with counsel, the judge clarified with the jury foreman (in counsels' presence) what this question meanti.e., was the second option on the special verdict form ("Larry Neal Oliver, *1004 Jr. was killed by a person other than Jermaine Lebron") the same as the (3) "or" option in the Felony Murder First Degree instruction ("Larry Neal Oliver, Jr. was killed by a person other than Jermaine Lebron but both Jermaine Lebron and the other person who killed Larry Neal Oliver, Jr. were principals in the commission of robbery"). The jury was then advised that "the following part of the felony murder first degree instruction, `(3) Larry Neal Oliver was killed by a person other than Jermaine Lebron but both Jermaine Lebron and the person who killed Larry Neal Oliver were principals in the commission of robbery,' is reflected by special finding as to felony murder option number 2, which reads `Larry Neal Oliver, Jr. was killed by a person other than Jermaine Lebron.'" The jury was also asked, "What other options are you referring to?" However, the jury did not, thereafter, send the judge any further notes.
Upon full deliberation, the jury returned the verdict forms and found, as to Count I, that Lebron was guilty of felony murder first degree. It found that Oliver was killed by a person other than Lebron, and that Lebron did not have a firearm in his possession during the commission of the offense charged in Count I. As to Count II, the jury found Lebron guilty of robbery with a firearm. It found that Lebron did have a firearm in his possession during the commission of Count II. Based upon the jury's findings, Lebron was convicted of first-degree murder and armed robbery.

Penalty Phase Proceedings
The penalty phase consisted of the presentation by the State of additional evidence, a Spencer[2] hearing, and a sentencing hearing. During the penalty phase, the State maintained that it had been improper to use a special verdict form in the guilt phase to determine whether Lebron was the shooter, because this issue should appropriately be determined during the penalty phase; that the jury's findings were contrary to the evidence; and that the court was thus not bound by these findings. Foreclosing this argument, the court indicated that the jury had made its determination.
The State proceeded to present evidence of three aggravators during the penalty phase: (1) that Lebron had committed the capital felony after having been convicted of a prior felony and placed on felony probation (possession of cocaine with intent to sell); (2) that Lebron was previously convicted of a felony involving the use of violence to a person,[3] and (3) that the capital felony was committed while Lebron was engaged in the commission of a robbery. (Rather than merging the pecuniary gain aggravator with this one, the court found that the pecuniary gain aggravator was not present). Specifically, the State presented the testimony of Ronald H. Schroeder, a Sergeant with the Tactical Force Unit, Kissimmee Police Department. Schroeder was involved with two relevant investigations: an aggravated assault with a firearm on Brandi Gribbin (which occurred *1005 prior to Oliver's murder), and an attempted first-degree murder, robbery with a firearm, and kidnaping of Roger Nasser (which took place after Oliver's murder). Both of these events had resulted in convictions prior to the penalty phase in the Oliver murder.
Shroeder testified that Lebron became embroiled in an argument with Brandi Gribbin over nonpayment of rent she owed for an apartment which he did not own, and in which he did not live. "An argument ensued and escalated where Mr. Lebron left the apartment, came back in with a shotgun and ordered her to leave.... He pointed it at her, ordered her out and he also struck her in the face with the butt of the shotgun."[4]
With respect to the incident involving Roger Nasser, Shroeder testified that he obtained Nasser's sworn statement regarding what had happened to him. Nasser stated that he had stopped by the same apartment to help Stacie Kirk move. While Nasser was at the apartment, Kendall and Lebron (whom Nasser did not know) entered the apartment and went to the back room. Shortly thereafter, they returned, with Lebron carrying a shotgun, and Kendall having a stun gun in his hands. Lebron and Kendall robbed Nasser. Lebron pointed the shotgun at Nasser and, at some point, gave the shotgun to Kendall while Lebron slapped and kicked Nasser. Then, Lebron blindfolded Nasser and escorted him at gunpoint to a vehicle in the parking lot. After they entered the vehicle, Kendall drove and Nasser was seated in the back between Kirk and Lebron. While Nasser was being transported to their destination, Kirk and Lebron alternated in using the stun gun on Nasser to the head and [genital][5] area.
When the group arrived at a remote orange grove area in the Lake Gentry area of Osceola County, Nasser was ordered out of the vehicle. Lebron still held the shotgun, and he required Nasser to kneel and face him. Nasser stated that Lebron then put the shotgun to his chest and said, "Tell the Lord Bugsy said `Hi.'" Lebron then squeezed the trigger, but the gun misfired.
Lebron returned to the truck in an attempt to either reload or repair the weapon. Nasser was then able to run into the orange groves and hide. He waited some time before seeking safety in a nearby residence. Later that morning, Nasser gave his statement to law enforcement. He also identified Lebron from a photographic lineup. Lebron's convictions for the two incidents involving Gribbin and Nasser were entered into evidence. Lebron's New York convictions for attempted *1006 robbery and possession of cocaine with intent to sell, reflecting that Lebron was on probation at the time of Oliver's murder, were also entered into evidence. Finally, the State presented victim impact testimony from the Olivers regarding their son's uniqueness.
The defense presented portions of the testimony of Joe Tocci and Charissa Wilburn given in the Gribbin assault trial. No other evidence was presented. During the penalty phase closing argument, the prosecutor said, "I would submit to you that it has been established beyond any question that the defendant, Jermaine Lebron, is the individual who killed Larry Neal Oliver, Junior." The defense objected, and moved for a mistrial. The court sustained the objection, and instructed the jury to disregard counsel's remark, but did not declare a mistrial. The defense then argued that someone other than Lebron was the shooter, that the other participants had received light sentences, and that Lebron played a limited role in the murder. After receiving appropriate instructions, the jury retired to consider its recommendation. By a seven-to-five vote, the jury recommended that Lebron receive the death penalty.
A Spencer hearing was held, at which deposition testimony of Lebron's mother, Jocelyn Ortiz, was presented. Lebron also presented certain school records from his childhood, which appear to have been compiled at the various State residential schools in which Lebron was placed over the years through a New York State agency, at his mother's request. Based upon consideration of all the evidence and the jury's recommendation, the trial court found that three aggravating circumstances had been established: (1) the capital felony was committed by a person previously convicted of a felony and placed on felony probation; (2) the defendant was previously convicted of a felony involving the use or threat of violence to a person; and (3) the capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of the crime of robbery. The court did not find the pecuniary gain aggravating factor, since "the State may not rely upon a single aspect of the offense to establish multiple aggravating circumstances."
The court rejected the proposed mitigating circumstance that "the defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor." The defense argued that the court was bound by the jury's determination that Lebron was not the shooter, and that such finding supported this mitigator, which should be found and given great weight. The court interpreted its obligation under section 921.141, Florida Statutes (1995),[6] as imposing a "responsibility to independently review the evidence and consider the credibility of each witness." The court then recited the evidence related to Lebron's participation in the incident, concluding:
The evidence in this case, through the testimony of the witnesses, clearly establishes beyond any reasonable doubt that Jermaine Lebron, the defendant, killed Larry Neal Oliver, Jr. The defendant was the one who lured the victim back to his house. It was the defendant who, on the way to his home, said he *1007 was going to jack this guy; that he was going to do it for all the guys to see. It was the defendant who lured the victim to the back of the house. It was the defendant who blew off the victim's head with a shotgun. It was the defendant who directed the clean up of the crime scene and the disposal of the victim's body and his truck.
The role of the defendant, Jermaine Lebron, in the murder and robbery of Larry Neal Oliver was anything but minor. The defendant was the producer, director, chief actor, and shooter in the murder of the victim.
While this Court is ever mindful that the jury found that someone other than the defendant killed the victim, the evidence presented in this case does not support that position. The only thing that supports that position was the argument of defense counsel. The Court has carefully reviewed the testimony of each and every witness that testified in this matter and considered the credibility of each witness in reaching its decision concerning this mitigating factor. The Court is also mindful that the jury was instructed concerning this mitigating factor and still a majority of the jury recommended a sentence of death. The court rejected the proposed mitigating circumstance that "the defendant was an accomplice in the capital felony committed by another person.
The Court finds that this mitigating factor is not present.
The court also found that the defendant's age (twenty-one years old at the time the crime was committed) was not a mitigating factor, because there was "no evidence that the defendant was not mentally and emotionally mature." The trial court found no other statutory mitigators, but found several nonstatutory mitigating factors, which it accorded either very little weight or some weight.[7]
*1008 The trial court then engaged in an analysis to determine whether the culpability requirements of Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), had been met, first stating the applicable standard established in Tison, 481 U.S. at 157-58, 107 S.Ct. 1676, that "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." Based upon an articulated analysis of the record evidence, the court observed that it "established beyond a reasonable doubt that the defendant murdered Larry Neal Oliver, Jr., and that, if not, he was a major participant in the felony and acted with reckless disregard for human life." He concluded, on this basis, that Lebron "was a major participant in the felony committed in this case and at the very least was recklessly indifferent to human life," and, therefore, that the Enmund-Tison culpability criteria had been satisfied. Finding that the aggravators here greatly out-weighed the mitigators, the trial court sentenced Lebron to death.

II. ANALYSIS

Double Jeopardy
Lebron raises seven claims on appeal.[8] First, he contends that his retrial was a violation of double jeopardy. Here, the trial judge had declared a mistrial based upon jury deadlock. This occurred after it had come to the trial court's attention, through an in-camera, transcribed communication between a juror and the trial *1009 court[9] (which was immediately disclosed by the court to both counsel, neither of whom objected), that the jury foreman had failed to disclose a bias[10] against the police. Immediately following this disclosure, the jury had sent a note to the trial court indicating that the jury "continue[d] to be divided from beginning to the end." The trial court then conducted the following proceeding in open court, with both counsel and the defendant (but not the jury) present:
THE COURT: You may be seated. Let the record reflect that the defendant is present along with counsel for the defendant, the assistant state attorney.
I have the following note from the jury: we, the jury, feel that we cannot and will not be able to reach a verdict on either counts one or count two. We continue to be divided from beginning to the end.
Signed, the foreman, [foreman's name]
The court indicated that the jury was hopelessly deadlocked. It also related the substance of the in-camera discussion[11] *1010 in which juror "Doe" had suggested that one of the other jurors may have lied during voir dire. The court indicated a belief that it would be useless to give an Allen charge.
Lebron's counsel stated that he wanted the Allen charge to be read to the jury. The State Attorney suggested that an alternate be substituted for juror 1227. The court announced its intention to bring the jury into the courtroom and inquire whether they felt that additional instructions or deliberations would help, indicating that, if the jury said "No," the court would declare a mistrial. Neither side objected. The jury was then brought in, and the court read aloud the foreman's note. The judge asked each juror if he or she thought that "any additional instructions by the court or any additional deliberations by you would end this impasse that you currently have?" Four of the jurors answered that they were "not sure"; eight answered either "no" or "I don't think so." Without objection, the court then declared a mistrial. The jury was dismissed, and a new trial date was discussed. When defense counsel later filed a motion to dismiss the indictment[12] prior to retrial, the trial court denied the motion, indicating that, after the jury's note was submitted following twelve hours of deliberation, there was no need to continue a hopeless task.
Where a defendant objects to the declaration of a mistrial, the burden is on the State to show that there was a manifest necessity for the trial court's determination; otherwise, double jeopardy attaches. See Thomason v. State, 620 So.2d 1234, 1237-1238 (Fla.1993). As stated by this Court in Thomason, "[t]he manifest necessity standard must be applied on a case-by-case basis and cannot be applied mechanically." Id. (citing Arizona v. Washington, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978); Strawn v. State ex rel. Anderberg, 332 So.2d 601 (Fla.1976); Adkins v. Smith, 205 So.2d 530, 532 (Fla. 1967)). This Court has indicated that jury deadlock is a valid ground for the declaration of a mistrial. See State ex rel. Williams v. Grayson, 90 So.2d 710, 713 (Fla.1956) ("Illustrative of the urgent or necessary reasons that would justify the discharge of the jury at the stage of the trial mentioned would be: (a) the illness of the judge, the accused, or a juror requiring the absence of any of them from the court, or (b) the inability of the jury to agree on a verdict after due and proper deliberation, or (c) a consent of the accused himself."). *1011 Thus, if the trial court in this case properly declared a mistrial based upon sufficient record evidence of a hung jury, then double jeopardy does not attach. See United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824) (holding that a defendant in a capital case might be retried after the trial judge had, without the defendant's consent, discharged a jury that reported itself unable to agree); see generally Rose v. Dugger, 508 So.2d 321 (Fla.1987).
In Rosea case in which the defendant's first trial had ended in a mistrial which was concededly due to a hung jurythis Court approved the analysis set forth in Richardson v. United States, 468 U.S. 317, 326, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984), stating:
[Rose] contends that if his motions for judgment of acquittal at the close of the state's case and at the close of all the evidence were improperly denied in the first trial, then his later trial and convictions would be barred by the double jeopardy clauses of the fifth amendment of the United States Constitution and article I, section 9 of our state constitution. This contention, as it relates to the United States Constitution, has been considered and rejected in Richardson v. United States, 468 U.S. 317, 326, 104 S.Ct. 3081, 3086, 82 L.Ed.2d 242 (1984):
[W]e reaffirm the proposition that a trial court's declaration of a mistrial following a hung jury is not an event that terminates the original jeopardy to which petitioner was subjected. The Government, like the defendant, is entitled to resolution of the case by verdict from the jury, and jeopardy does not terminate when the jury is discharged because it is unable to agree. Regardless of the sufficiency of the evidence at petitioner's first trial, he has no valid double jeopardy claim to prevent his retrial. (Emphasis supplied.)

See United States v. Brack, 747 F.2d 1142, 1148 (7th Cir.1984) (regardless of the sufficiency of the evidence presented at the first trial, when first trial ended in mistrial due to a hung jury, no valid double jeopardy claim to prevent retrial), cert. denied, 469 U.S. 1216, 105 S.Ct. 1193, 84 L.Ed.2d 339 (1985); Berry v. State, 458 So.2d 1155, 1156 (Fla. 1st DCA 1984) (double jeopardy applies only if there has been some event, such as an acquittal, that terminates the original jeopardy; the failure of a jury to reach a verdict and a trial court's declaration of a mistrial due to a hung jury are not events terminating original jeopardy). See also Tibbs v. Florida, 457 U.S. 31, 42, 102 S.Ct. 2211, 2218, 72 L.Ed.2d 652, (1982) ("[a] deadlocked jury ... does not result in an acquittal barring retrial under the Double Jeopardy Clause").
We recognize that this Court has the power and authority to construe our Florida Constitution in a manner which may differ from the manner in which the United States Supreme Court has construed a similar provision in the federal constitution. See PruneYard Shopping Center v. Robins, 447 U.S. 74, 81, 100 S.Ct. 2035, 2040, 64 L.Ed.2d 741 (1980). See also State v. Kinchen, 490 So.2d 21, 23 (Fla.1985) (Ehrlich, J., concurring in part and dissenting in part). We are persuaded, however, that the view expressed in Richardson is logically correct and we see no intent on the part of the people of Florida that our double jeopardy provision should be construed differently. Therefore, we hold that article I, section 9 of the Florida Constitution does not prohibit a defendant's retrial when a prior trial has been concluded by mistrial because of a hung jury.
*1012 Rose, 508 So.2d at 322-23. The question here, then, is whether the trial court explored all reasonable alternatives prior to declaring the mistrial, and whether the mistrial was properly declared. As this Court stated in Thomason, 620 So.2d at 1239, "[t]he double jeopardy provision of the Florida Constitution requires a trial judge to consider and reject all possible alternatives before declaring a mistrial over the objection of the defendant, and we decide this case under that provision. Art. I, § 9, Fla. Const." Thus, it is incumbent upon the trial court to discuss alternatives before declaring a mistrial over the objection of the defendant's counsel and the State.
In this case, Lebron, in maintaining (in his argument in support of a motion filed immediately prior to his retrial) that the trial court should not have declared a mistrial, argued that the court should have given an Allen charge, or a modified Allen charge, and sent the jury back in to deliberate on the question of whether they were truly deadlocked or would find further instruction helpful. However, the record reflects that, other than requesting an Allen charge, defense counsel did not suggest any of the alternatives which he later argued the trial court should have employed, even though such omission did not constitute consent to the mistrial. See State ex rel. Williams v. Grayson, 90 So.2d 710, 713 (Fla.1956) (observing that "the silence of the defendant on trial for a crime or his failure to object or protest against an illegal discharge of the jury before verdict does not constitute a consent to such discharge"). In fact, it was the trial court's own proposal that the jurors be individually polled to ask if further instruction or deliberation would be helpful, which was ultimately pursued.
Moreover, the jury appears to have already deliberated for a day and a half at the time this issue arose. Prior to individual polling, the trial judge read the jurors' note back to them, stating that he was "going to read the note to make sure that you all concur in this." The note read, "We, the Jury, feel that we cannot and will not be able to reach a verdict on either Count One or Count Two. We continue to be divided from beginning to end." The trial court then inquired, "Members of the Jury, do you think any additional instruction by the court or any additional deliberations by you would end this impasse that you currently have?" to which the jury as a whole responded, "No," and one juror spontaneously expressed the opinion that "it is hopeless." When the trial court proceeded to poll the individual jurors in the presence of counsel, four of them indicated that they were "not sure" whether further instruction or deliberation would be helpful; eight indicated unequivocally that it would not be.
This Court has stated that it is recommended, but not required, that the trial court, in case of apparent jury deadlock, give an Allen charge prior to declaring a mistrial. See Thomas v. State, 748 So.2d 970, 978 n. 7 (Fla.1999) (citing State v. Bryan, 290 So.2d 482 (Fla.1974)). However, as the trial court here noted, in some instances it may be error to give the charge due to its potentially coercive effect on those jurors who are in the minority. See Thomas, 748 So.2d at 976 (recognizing "that a trial court should not couch an instruction to a jury or otherwise act in any way that would appear to coerce any juror to reach a hasty decision or to abandon a conscientious belief in order to achieve a unanimous position").[13] For example, *1013 it has been held to be error to give an Allen charge where the jury has improperly indicated its numerical split. Cf. Thomas, 748 So.2d at 979 (observing that, in assessing whether the trial court's decision to give an Allen charge was error, "the other prevailing circumstances, including the length of the deliberations, the lateness of the hour, the condition of the jurors, and the jury's disclosure of their numerical split raise[ ] additional concerns"); Washington v. State, 758 So.2d 1148, 1153 (Fla. 4th DCA 2000); Scoggins v. State, 691 So.2d 1185, 1187-88 (Fla. 4th DCA 1997) (concurring and agreeing with the Michigan Supreme Court's reasoning that, "[w]hen combined with comments that belie the judge's feelings, or with instructions such as the jury deadlock charge, disclosure of the jury's numerical division risks conveying the message that the court believes that the majority should prevail, creating the `doubly coercive effect of melting the resistance of the minority and freezing the determination of the majority'") (quoting People v. Wilson, 390 Mich. 689, 213 N.W.2d 193, 195 (1973)), approved, Scoggins v. State, 726 So.2d 762, 766-67 (Fla.1999). As stated in this Court's Scoggins opinion:
We conclude that the potential for harm is inherent in an inquiry as to numerical division. The deliberations of a jury are extremely sensitive, and nothing should be done by the trial court to directly or indirectly influence a jury's deliberations, especially in a way that might divide or cast one juror or group of jurors against the others. Even ambiguous and subtle influences upon a minority quantified or identified by number can disturb the sensitive process by which jurors attempt to decide the case and resolve their differences. It is one thing for there to be a division that may occur and change naturally during the course of confidential deliberations. It is quite a different thing to identify and focus on the division in open court, outside the give and take exchange among jurors during their confidential proceedings. To permit otherwise would risk tainting the outcome of the trial by shifting the jury's focus from the law and evidence before it to the judge's motivation in inquiring into the status of a verdict. As Judge Gross noted, if the judge must inquire into the possibility of a verdict, "the better practice is to admonish the jury at the outset not to indicate how they stand as to conviction or acquittal." Scoggins, 691 So.2d at 1188.
Scoggins, 726 So.2d at 766-67. Here, after immediately advising counsel regarding the substance of what an unidentified juror had reported to the court in-camera (in the presence of the bailiffs and the court reporter, who had transcribed the proceedings), the judge, after first intimating that the sanctity of jury deliberations should not be disturbed, correctly refused to follow the State's suggestion that the juror alleged to have lied on voir dire be replaced with an alternate, stating that there was "absolutely no evidence for me to go in and inquire and replace that particular juror because that particular juror may or may not be the holdout." Therefore, the trial court did not err in not giving the Allen charge prior to declaring a mistrial.
Additionally, where, as here, the trial court has initially been made aware of juror misconduct through a source other than the juror alleged to have caused the jury taint, such information, *1014 where corroborated, has been deemed to require the declaration of a mistrial. See Lebron v. State, 724 So.2d 1208 (Fla. 5th DCA 1998) (holding that a juror's failure to timely disclose to the trial court his suspicion that the accused had murdered the juror's friend was juror misconduct, warranting a new trial). Here, juror Doe advised the judge of his belief that the foreman (contrary to the statement he had made during voir dire) was biased against police due to his interrogation when he was a juvenile charged with a criminal offense. The identified juror had expressed the view that all police are bad. However, when specifically asked during voir dire whether he had any bias as a result of his experiences with the juvenile justice system, this juror had indicated that he did not.
A juror's nondisclosure of information during voir dire warrants a new trial if it is established that the information is relevant and material to jury service in the case, the juror concealed the information during questioning, and failure to disclose the information was not attributable to counsel's lack of diligence. Cf. Jennings v. State, 512 So.2d 169, 173 (Fla. 1987) (observing that a juror's concealment on voir dire of information which may have been material to whether the juror would have been excused on peremptory challenge or for cause, and which is not revealed or discovered until after trial, can justify the granting of a new trial); Lebron v. State, 724 So.2d 1208 (Fla. 5th DCA 1998) (holding that a juror's failure to timely disclose to the trial court his suspicion that the accused had murdered the juror's friend was juror misconduct, warranting a new trial); Marshall v. State, 664 So.2d 302 (Fla. 3d DCA 1995) (holding that a juror's failure to disclose that she volunteered at the jail where the defendant was held constituted juror misconduct and entitled the defendant to new trial); Blaylock v. State, 537 So.2d 1103, 1106-07 (Fla. 3d DCA 1988) (reflecting that nondisclosure is considered material if it is substantial and important so that if the facts has been known, the complaining party might have been influenced to peremptorily exclude the juror from the jury), review denied, 547 So.2d 1209 (Fla.1989); but cf. James v. State, 751 So.2d 682 (Fla. 5th DCA 2000) (holding that a prospective juror's failure to disclose, during voir dire, that she had two close relatives who had been convicted of crimes was not material, and thus no new trial was required). The State, as well as the defendant, is entitled to an impartial jury. See generally State v. Aldret, 606 So.2d 1156, 1157-58 (Fla. 1992);[14]cf. Peteet v. State, 631 S.W.2d 816, *1015 817(Tex.App.1982) (holding, inter alia, that, pursuant to the applicable rule of criminal procedure [which provided that a challenge for cause could be made alleging some fact which renders a juror incapable or unfit to serve on the jury, for enumerated reasons including that the prospective juror "has a bias or prejudice in favor of or against the defendant"], the trial court properly granted the state's motion to strike a prospective juror for cause where, during voir dire, the prospective juror stated that he had been charged with burglary when he was a juvenile, and that such experience produced a bias in favor of the appellant, greater than the presumption of innocence to which he was entitled).
On this record, because there was a manifest necessity to declare a mistrial (based upon jury deadlock) in Lebron's first trial, the trial judge did not abuse its discretion in doing so. However, there is an additional principle which bears examination in this case. As recognized by the Court in Robinson v. State, 574 So.2d 108, 112 (Fla.1991), the United States Supreme Court, in Oregon v. Kennedy, 456 U.S. 667, 669, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), "made an exception to the general principle [that a mistrial to which the defendant consents will generally not bar retrial] whenever the state deliberately provokes the defendant into moving for a mistrial." The principle has been stated to include judicial misconduct calculated to goad the defense into requesting a mistrial. See Roundtree v. State, 706 So.2d 95, 96 (Fla. 3d DCA 1998) ("Where ... a mistrial consented to by the defendant is based on bad-faith prosecutorial or trial court misconduct intentionally designed to provoke a mistrial, the state is barred by double jeopardy from ever retrying the defendant for the same offense or offenses.").[15]
Therefore, if it appeared from the record that the trial court's conduct in meeting with the juror in-camera without trial counsel was done with the intent to goad the defense into moving for a mistrial, double jeopardy would apply. However, the record here does not in any way support such a conclusion.
First, there is no evidence or indication that the judge had reason to know the content of the information ultimately disclosed by the juror. This Court has held that, where, as here, there are communications between the judge and a juror outside the express notice requirements of rule 3.410, Florida Rules of Criminal Procedure, a harmless error analysis applies. See Williams v. State, 488 So.2d 62, 64 (Fla.1986). Indeed, the United States Supreme Court has held that, even where such communications are not recorded (as they were here) and are not subsequently disclosed to counsel (as they were, immediately, here), they are still subject to a harmless error analysis. See Rushen v. Spain, 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983).
In Rushen, the United States Supreme Court "emphatically disagree[d]" with the Ninth Circuit's conclusion that an unrecorded ex parte communication between a trial judge and juror can never be harmless error, stating:

*1016 Our cases recognize that the right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant. [Note 2] "At the same time and without detracting from the fundamental importance of [these rights], we have implicitly recognized the necessity for preserving society's interest in the administration of criminal justice. Cases involving [such constitutional] deprivations are [therefore] subject to the general rule that remedies should be tailored to the injury suffered ... and should not unnecessarily infringe on competing interests." United States v. Morrison, 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1981); see also Rogers v. United States, 422 U.S. 35, 38-40, 95 S.Ct. 2091, 2094-2095, 45 L.Ed.2d 1 (1975). In this spirit, we have previously noted that the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation ... [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." Smith v. Phillips, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). There is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial. The lower federal courts' conclusion that an unrecorded ex parte communication between trial judge and juror can never be harmless error ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of criminal justice.
[Note 2]. Petitioners have apparently conceded, in both federal and state court, that the undisclosed ex parte communications established federal constitutional error. See Pet. for Cert. 29-31. We acknowledge that the trial judge promptly should have notified counsel for all parties after the juror approached him. Whether the error was of constitutional dimension in this case is not before us. Because we find that no actual prejudice was shown, we assume, without deciding, that respondent's constitutional rights to presence and counsel were implicated in the circumstances of this case. Justice Stevens suggests that the only constitutional right implicated in this case is a possible due process right to a midtrial hearing on the subject of the juror's impartiality. See post, [104 S.Ct.] at 456 (Stevens, J., concurring in the judgment). Had the State raised the underlying constitutional right as an issue in the courts below and in its petition for certiorari, this approach might merit consideration. But the case came to us alleging harmless violations of the right to be present during all critical stages of the proceedings and the right to be represented by counsel, and we therefore analyze only that challenge. These rights, as with most constitutional rights, are subject to harmless error analysis, see, e.g., United States v. Morrison, 449 U.S. 361, 364-365, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981) (right to counsel); Snyder v. Massachusetts, 291 U.S. 97, 114-118, 54 S.Ct. 330, 78 L.Ed. 674 (1934) (right to presence), unless the deprivation, by its very nature, cannot be harmless. See, e.g., Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).
464 U.S. at 117-19, 104 S.Ct. 453. While the more prudent course may have been for the trial judge to advise counsel prior to meeting with the juror in the presence *1017 of the bailiffs and the court reporter, no specific rule or case law clearly mandated that such an in-camera meeting was error.[16]
Further, here the transcript reflects no break between the time the trial court was advised of a problem by the juror and the time the judge met with counsel in open court, disclosing his contact with the juror, indicating the substance of the juror's disclosure, and asking counsel for their comments. The record reflects that neither party objected to the court's having met in-camera with the juror. Rather, defense counsel requested an Allen charge, and the State requested that an alternate juror be substituted for the juror alleged to have lied on voir dire. The totality of the circumstances reflected in this record discredits a finding that there was any intentional misconduct on the trial court's part in meeting with the juror in-camera, or any intent to goad the defendant into requesting a mistrial. In the absence of such bad faith conduct (assuming that the contact was prejudicial, but not willfully so), the proper remedy is a new trial[17] (which the defendant, in this case, received). Cf. Robinson v. State, 574 So.2d 108, 112 (Fla.1991) (observing that "not all prosecutorial misconduct that mandates reversal is intended to provoke the defendant into moving for a mistrial," thereby implicating double jeopardy concerns).
As we stated in Strawn v. State ex rel. Anderberg, 332 So.2d 601, 604 (Fla.1976) (quoting Adkins v. Smith, 205 So.2d 530, 532 (Fla.1967)), "[w]here, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant's consent and even over his objection, and he may be retried consistently with the Fifth Amendment." On this record, we find that a mistrial based upon jury deadlock was properly declared.

*1018 Motion to Continue Trial
Lebron next asserts that the trial court abused its discretion in denying his motion to continue the rescheduled trial date due to the absence of co-counsel Norgard during the jury selection and guilt phases of the trial. The denial of a motion for continuance is committed to the sound discretion of the trial judge, see Gorby v. State, 630 So.2d 544, 546 (Fla. 1993), which was not abused in this case. Here, the record reflects that counsel Slovis was well qualified to proceed. As he indicated to the trial court, he had tried over seventy murder cases, and was an expert in such proceedings. He had also tried Lebron's original trial in October 1997 with attorney Norgard, and had participated throughout the entire trial, including being present for jury selection. He had done "most of the witnesses in this last trial"; Norgard had done "eighty percent" of jury selection, and had handled only six witnesses and the closing argument. Although Slovis claimed that he felt "incompetent to pick a jury in a death penalty case," he added that "nothing has changed as relates to jury selection." Judge Perry noted for the record that Slovis was lead counsel and "did the lion's share of the work in this particular case" the first time. Slovis had the witness depositions from the first trial, and he "did a very masterful and skillful job of cross examination." Slovis also "did the extensive questioning during ... general voir dire," and was lead counsel in the retrial. To address Slovis's concern regarding the selection of a death-qualified jury, Judge Perry ruled that he would question the prospective jurors in accordance with "the standards of Witt v. Wainwright," and would see to it that "a fair and impartial jury" would be seated. He outlined the procedure which he would employ to ensure that an adequate death penalty voir dire would be conducted, and did continue the proceedings for twenty-four hours.
This record does not reflect that good cause was shown for Lebron's request for a continuance, or that any prejudice resulted from denial of the motion. See generally Fla. R.Crim. P. 3.190(g)(2)-(3) (providing that good cause must be shown to grant a motion for continuance and, where such motion is made after a trial date has been set, the basis for good cause must have arisen after the case was set for trial). Cf. Morris v. Slappy, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983) (holding that a defendant's Sixth Amendment right to counsel was not violated by denial of his motion to continue trial until the deputy public defender initially assigned to defend him was available, where a senior trial attorney in the public defender's office was assigned to represent the defendant and the court was assured that the assigned attorney was fully prepared and ready for trial); Smith v. State, 48 Fla. 307, 37 So. 573 (1904) (finding no abuse of discretion in the trial court's denial of a motion for continuance due to lead counsel's absence, where other, equally well-qualified counsel was present); Furman v. State, 429 So.2d 763 (Fla. 1st DCA 1983) (holding that the trial court, after ascertaining that the public defender representing the probationer was adequately prepared, did not err in denying the probationer a continuance so that he could seek representation by counsel of his choice for probation revocation proceedings). The only inadequacy which Slovis expressed was his jury selection ability. However, the procedure which was employed more than adequately compensated for Slovis's perceived insecurity. During jury selection, Slovis asked appropriate questions, and made appropriate objections. In fact, he was quite vigorous in voicing objections throughout the trial. On this record, no abuse of discretion in *1019 denying the motion for continuance has been shown.

Ex Parte Communication
On the morning of trial, Lebron filed a Suggestion of Disqualification of Trial Judge, based upon the allegation that Judge Perry had engaged in an ex parte communication with the prosecutor regarding a scheduling matter. Specifically, Lebron alleged that, after defense counsel (Norgard) had contacted the prosecutor six days before the scheduled start of the retrial and advised that he would have motions for the judge to hear on the Friday before trial, the prosecutor had left a message for Norgard stating that he had advised the judge that defense counsel had a request for a continuance which he wanted to present on that date, but that Judge Perry had responded that he could not hear the motions at that time. The judge was leaving town, and any motions would be heard later. The trial court denied this motion as legally insufficient. Cf. Scott v. State, 717 So.2d 908, 911 (Fla.1998) (finding no abuse of discretion where the trial court denied the defendant's motion to disqualify the judge based upon allegations that the trial court had engaged in ex parte communications with the State in connection with "the setting of the date for the resumption of the evidentiary hearing"); Barwick v. State, 660 So.2d 685, 692 (Fla.1995) (finding no error in denial of the defendant's motion to disqualify the trial judge based, inter alia, upon a conclusory allegation that there was an ex parte communication between the judge and the assistant state attorney in which the assistant state attorney requested a hearing on the defendant's motion for appointment of a psychiatrist). A writ of prohibition was sought from the Second District Court of Appeal, which was denied. While we cautioned in Barwick that "a judge is not to have any substantive communication with counsel for any party, including counsel for the State, unless such communication is expressly authorized by statute or rule," 660 So.2d at 692, because the motion to recuse was based here upon allegations pertaining to the scheduling of a hearing on the defendant's motion for a continuance, the trial court did not err in denying the motion as legally insufficient.

"Committed While on Probation" Aggravator
Next, Lebron argues that the trial court erred in instructing the jury that Lebron was on felony probation at the time the crimes for which he was convicted were committed, and then finding this as an aggravating circumstance. This Court has held that, where, as here, the subject felony probation aggravator did not exist at the time the murder was committed, the trial court's finding of this aggravator violates the ex post facto provisions of the United States and Florida Constitutions. See Merck v. State, 763 So.2d 295, 299 (Fla.2000); Lukehart v. State, 762 So.2d 482 (Fla.2000); Zack v. State, 753 So.2d 9 (Fla.2000).
While this Court has held that a defendant can waive ex post facto protections as part of an agreed-upon bargain by both parties, see Bowles v. Singletary, 698 So.2d 1201 (Fla.1997) (finding that the inmate had waived any ex post facto argument as to forfeiture of gain time upon revocation of control release by accepting terms and conditions of early release under control release program), that is not the situation here. "[I]t is firmly established law that the statutes in effect at the time of commission of a crime control as to the offenses for which the perpetrator can be convicted, as well as the punishments which may be imposed." State v. Smith, 547 So.2d 613, 616 (Fla.1989) (quoting with approval Heath v. State, 532 So.2d 9, 10 (Fla. 1st DCA 1988)), quoted in Bates v. *1020 State, 750 So.2d 6, 19 (Fla.1999) (Harding, C.J., specially concurring).
Although at least one of Lebron's two remaining aggravators was grave (involving his two prior violent felony convictions), and the death penalty has been upheld in cases similar to this one[18] where there was no serious issue of the relative culpability of codefendants, the judge's error in finding the felony probation aggravator, which was not part of Florida law at the time the murder occurred, requires that we vacate Lebron's sentence of death, and order a new penalty-phase proceeding before a jury.

Rejection of "Minor Participant" Mitigator
Lebron also argues that the trial court erred in rejecting, as a mitigator, that Lebron was a "minor participant" in the crime. Specifically, Lebron asserts that the trial court erred in finding, contrary to the special verdicts rendered by the jury, that Lebron was the shooter in this case.
The trial court, cognizant of the jury's special verdicts,[19] undertook a thorough analysis pursuant to Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), to determine whetherassuming that Lebron was not the actual shooter the defendant was eligible for the death penalty because of the degree of his participation in the charged felonies. Consistent with the record evidence, the trial court determined that Lebron, who orchestrated the events leading to Oliver's death, was qualified pursuant to the Enmund-Tison culpability requirement for imposition of the death penalty, because, as the trial court found, he "was a major participant in the felony committed in this case and at the very least was recklessly indifferent to human life." Cf. DuBoise v. State, 520 So.2d 260, 265-66 (Fla.1988) (finding that a nontrigger person who is a major participant in a felony murder and whose conduct demonstrates reckless indifference to human life is death qualified); see generally Diaz v. State, 513 So.2d 1045 (Fla.1987) (establishing the mandate that trial courts shall include in their sentencing orders findings supporting the Enmund/Tison culpability requirement). The trial court also correctly analyzed Lebron's relative culpability, as compared to the other known participants, based upon its finding which is supported by the evidence adduced at trialthat the record was "totally devoid of any evidence of anyone else being responsible for the murder of the victim."
*1021 However, the trial court erred in concluding, contrary to the jury's express findings, that "the evidence established beyond a reasonable doubt that the defendant murdered Larry Neal Oliver, Jr." This error requires that Lebron's death sentence be vacated, and the case remanded for a new penalty phase. Upon remand, the trial court, in any resentencing of Lebron, may assess the defendant's relative culpability in light of the facts, established by the record, that Lebron was an orchestrator of and major participant in the felonies charged, and that no other known participant was proven to be the shooter. However, the sentence imposed cannot be premised upon a finding that Lebron was himself the shooter, since this would be contrary to the jury's special verdicts.

Rejection of Other Proposed Mitigating Factors
Finally, Lebron contends that the trial court erred in rejecting, as mitigators, Lebron's: (1) age (21 at the time of the crime); (2) abusive childhood (domestic violence); (3) race; (4) urban residence; (5) institutionalization; (6) psychological factors (in part); and (7) childhood accidents. This claim lacks merit.
The trial court did not err in rejecting Lebron's age as a mitigator. Although Lebron's school records (entered into evidence by the defense) reflected that he performed poorly academically and exhibited difficult social behaviors, they also reflected that he had been observed to express age-appropriate interests. The records show Lebron to have been a child of low average or average intelligence, with no indication of organic damage. They show that, up to age eighteen, Lebron was delayed in language and math skills, and had engaged in an escalating pattern of antisocial or delinquent behavior. They do not show, however, that Lebron was not acting at a level consistent with his chronological age at the time the murder was committed, or that his emotional or mental age is inconsistent with his chronological age.
Although rejecting certain other proposed mitigators, the trial court found, and weighed, factors relating to some of them. While it rejected a finding of domestic violence, it found Lebron's "Parent Profile" as a mitigator (assigning it very little weight). It also found, and gave very little weight to, the fact that Lebron's mother had used drugs, but was not addicted to them, during her pregnancy with Lebron. The court found Lebron's school performance to be a mitigating factor, to which it gave some weight, and also found that neglect had been proven, to which it gave some weight. The court found that the evidence established that Lebron had emotional problems, mental health problems, substance abuse problems, was hyperactive and suffered from a speech impairment (although there was no consistent notation in the school records over the years regarding such an impairment). However, the trial court also noted that "there was no testimony or evidence presented to show the nature and the degree of those psychological problems"; therefore, it gave very little weight to this factor.
The trial court found two of the mitigators which Lebron claims were rejected (institutionalization and psychological) to have been established, and it considered those factors (although "institutionalization" was taken into account in assessing Lebron's Parent Profile, rather than being recognized as a separate mitigator). Lebron made no specific reference to childhood accidents, and none appear to be documented in the record. With respect to Lebron's race (black Hispanic) and urban *1022 residence (New York City), Lebron has not cited any case law in support of the appropriateness of these elements as mitigating factors, nor demonstrated how, based upon the particular facts of this case, these claimed factors were shown to be mitigating as to this defendant.
While reasonable persons might differ regarding the weight which might have appropriately been assigned the various mitigators, the trial court does not appear to have wholly rejected any proven factors. Rather, consistent with this Court's mandate in Campbell v. State, 571 So.2d 415, 419 (Fla.1990), the sentencing order here reflects the trial court's careful consideration of all the evidence presented, and its reasoned determination regarding the weight to be accorded each factor which was established. See generally Trease v. State, 768 So.2d 1050, 1055 (Fla.2000) ("We hereby recede from our opinion in Campbell to the extent it disallows trial courts from according no weight to a mitigating factor and recognize that there are circumstances where a mitigating circumstance may be found to be supported by the record, but given no weight."); Beasley v. State, 774 So.2d 649, 671 (Fla.2000) (discussing proper weighing of mitigating and aggravating factors); Zack v. State, 753 So.2d 9, 19 (Fla.2000) (discussing proper weighing of factors); Blanco v. State, 706 So.2d 7, 10 (Fla.1997) (discussing proper weighing of factors); Campbell, 571 So.2d at 419 n. 3 (recognizing that the trial judge can identify and consider mitigators regarding a defendant's background "as categories of related conduct rather than as individual acts").
Based upon the foregoing, the convictions appealed from are hereby affirmed. The sentence of death is vacated, and the case is remanded for a new penalty-phase proceeding before a jury and resentencing, consistent with this opinion.
It is so ordered.
SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.
WELLS, C.J., recused.
NOTES
[1] Although Slovis conducted the majority of the venire questioning in the first trial, and was present during voir dire inquiry regarding the death penalty, Norgard assumed the lead with regard to interrogating prospective jurors concerning death penalty issues.
[2] Spencer v. State, 615 So.2d 688 (Fla.1993).
[3] This involved three separate incidents: (a) an attempted robbery, (b) an attempted first degree murder with a firearm, robbery with a firearm and kidnaping, and (c) an aggravated assault with a firearm. The attempted murder conviction (involving an assault on Roger Nasser) was subsequently reversed for a new trial due to prejudicial juror misconduct. See Lebron v. State, 724 So.2d 1208 (Fla. 5th DCA 1998). That case was retried during the pendency of Lebron's direct appeal here, and, upon retrial, the jury returned special verdicts finding that Lebron had committed assault with a firearm (instead of attempted first degree murder), robbery (instead of robbery with a firearm) and kidnapping with intent to commit a felony (again, without a firearm).
[4] On cross, the defense brought out those portions of the trial testimony in which Joe Tocci stated that Gribbin smacked Lebron, damaged the apartment by throwing mugs, and, in her anger at Lebron, went after a knife in the kitchen, which Joe grabbed from her. Charissa Wilburn also testified at trial that Gribbin smashed the dining room wall with a baseball bat. This conviction was affirmed on appeal in a brief opinion:

Lebron, appellant herein and a stranger to the lease arrangement involving the victim, ordered the victim to vacate the premises while telling her that "you're not the first `ho' I ever killed and you won't be the last" and pointing a sawed-off shotgun at her. In perhaps the most frivolous appeal to have been filed in this court, Lebron contends his action was justified because the victim had threatened him on an earlier occasion and because she had damaged the apartment with a baseball bat. We reject Lebron's legal position and affirm the trial court's denial of his motion for acquittal and uphold his conviction for aggravated assault with a firearm.
Lebron v. State, 717 So.2d 72 (Fla. 5th DCA 1998) (emphasis supplied).
[5] The transcript reflects that the stun gun was used on Nasser's head and "general" area.
[6] That section provides, in pertinent part: "Upon conviction or adjudication of guilt of a defendant of a capital felony, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment.... (3) ... Notwithstanding the recommendation of a majority of the jury, the court, after weighing the aggravating and mitigating circumstances, shall enter a sentence of life imprisonment or death...."
[7] With respect to the nonstatutory mitigating factors raised by the defense, the trial court found as follows:

(1) Disparate treatment of codefendants. The court again reviewed the record evidence, concluding that it was "crystal clear from the evidence that Charissa Wilburn's, Vern Williams', Dwayne Sapp's, Joe Tocci's, Mark Tocci's, Danny Summers' and Mary Lineberger's participation in this crime was substantially less than that of the defendant. There is nothing in their treatment by the Court which would justify mitigation because without question each of them is less culpable than the defendant." Thus, the trial court rejected this as a mitigating factor.
(2) Prenatal Problems-Drug Addicted Mother. The mother testified that she used drugs, but was not addicted to them, during her pregnancy. There was no evidence of the effect of the mother's drug use on Lebron. The trial court found this to be a mitigating factor, to which it gave very little weight.
(3) School Performance: The court found this to be a mitigator, giving it some weight.
(4) Interpersonal: The court found no evidence that the defendant had an exaggerated need for approval, was easily led by others, or had shallow emotional attachments. He found that there was evidence that Lebron was good with some children, and accepted this as "somewhat of a mitigating factor," to which he gave very little weight.
(5) Parent Profile: The court found that no evidence had been presented regarding what effect Lebron's mother's lifestyle, and his father's absence and criminal history, had on Lebron. The court found this mitigating factor, and gave it very little weight.
(6) Neglect: The court observed that this factor was proven, but there was no evidence of its effect on the defendant. The court gave this mitigator some weight.
(7) Domestic Violence: The court found that the testimony of the defendant's mother established that she hit him once with a closed fist, but that neither the mother's testimony nor record evidence supported the notion that Lebron was psychologically abused. The court found that the evidence did not support a finding of this mitigator.
(8) Race: the court rejected the contention that the fact that Lebron was a black Hispanic should be treated as a mitigating factor.
(9) Urban Resident: the court rejected the position that the fact that Lebron was from New York City should be considered as a mitigating factor.
(10) Institutionalization: the court considered this under the Parent Profile mitigator.
(11) Behavior During Incarceration: the judge found that there was no evidence regarding whether Lebron maintained family contacts, or made any escape attempts, during his incarceration. He found that the defendant behaved properly at trial, but did not display any conduct which went beyond what is normally expected of defendants. He found this to be a mitigating factor, and gave it very little weight.
(12) Psychological: The court found that the deposition of Lebron's mother, certain treatment notes/records, and Lebron's school records established that Lebron had emotional problems, mental health problems, substance abuse problems, is hyperactive and suffers from a speech impairment. However, the court noted that no testimony was presented to explain or show the extent to which those psychological problems affected Lebron. While the court found those factors to be mitigating, it gave very little weight to this factor, "since there was no testimony or evidence presented to show the nature and the degree of those psychological problems."
(13) Childhood Accidents: the court, finding no evidence of these, rejected this factor.
[8] These are (1) that double jeopardy barred Lebron's retrial; (2) that the trial court erred in denying Lebron's motion to continue the retrial due to the absence of attorney Norgard; (3) that the trial court erred in denying Lebron's motion to recuse based upon an alleged ex parte communication between the judge and the prosecutor regarding a scheduling matter; (4) that the trial court erred in finding the "committed while on probation" aggravator; (5) that the trial court erred in rejecting Lebron's proposed "minor participant" mitigator; (6) that the trial court erred in rejecting other statutory and nonstatutory mitigating factors which Lebron had proposed; and (7) that Lebron's death sentence is not proportional. Our disposition of this appeal makes the proportionality issue moot.
[9] During the deliberations phase of Lebron's first trial, the following exchange regarding juror 1227 occurred:

(The following held in chambers with Judge Perry, juror [John Doe], the court reporter and the courtroom deputies only. No attorneys present).
THE COURT: Let the record reflect that we are in chambers present withyour name, sir?
MR. [DOE]: [Juror spells his name].
THE COURT: Mr. [Doe], there was something you wanted to convey to me?
MR. [DOE]: During our course of deliberations, your honor, I have one particular juror who keeps referring to the fact of previous experience dealing with the police and his interrogation and experience with interrogation; and I feel that I bring into question whether he falsified his juror statement, because I feel that this problem should have come out in the jury selection; and I'm concerned with that fact.
THE COURT: Did he elaborate on what, if any, experiences he'd had with interrogation?
MR. [DOE]: Yes, your honor. Can you elaborate a little bit, your honor?
THE COURT: What did he say about his experiences and what led you to believe that he may have falsified or lied on his questionnaire?
MR. [DOE]: The interrogation he brings up are, like, the whole police department is against him; and I feel his point of view is all the police are bad.
THE COURT: Okay. Let me ask you this. Did he ever indicate that he had been arrested?
MR. [DOE]: Yes, your honor.
THE COURT: Okay. Did he ever indicate that he had been interrogated by the police?
MR. [DOE]: Yes, your honor.
THE COURT: Okay. And what is that juror's name?
MR. [DOE]: [Identifies the jury foreman, juror 1227].
THE COURT: Okay. Thank you, sir.
[10] During voir dire, in response to the state attorney's questions directed at disclosing potential bias, juror 1227 stated as follows:

MR. ASHTON: Let me ask you one other question. If any of these questionsand the judge has already said this, but if any of the questions that I ask touch upon areas that are sensitive, that you would rather not speak about in front of everybody, please feel free to excuse yourself and come forward and we'll talk about it with just the attorneys and the judge.
You indicated that you knew someone that had been accused of a crime. Would you tell me who that was or what the crime was.
JUROR 1227: It was myself and it would be as a juvenile for breaking and entering.
MR. ASHTON: All right. By looking at you, it has not been the last couple of years.
JUROR 1227: No.1980.
MR. ASHTON: Anything about that experience that would give you any bias for or against judges, lawyers, cops, defense attorneys, anybody?
JUROR 1227: Just greater respect for the law from that point on.
MR. ASHTON: Okay. So, in other words, it had its purpose. That's good.
[11] Even though the situation here did not fall within the express ambit of rule 3.410, Florida Rules of Criminal Procedure, we do not condone such post-deliberation, in-camera meetings between a juror and the trial court (even where, as here, the proceedings are transcribed by a court reporter) where counsel is absent. Cf. Fla. R.Crim. P. 3.410 (providing that "[a]fter the jurors have retired to consider their verdict, if they request additional instructions or to have any testimony read to them they shall be conducted into the courtroom by the officer who has them in charge and the court may give them the additional instructions or may order the testimony read to them," and that "[t]he instructions shall be given and the testimony read only after notice to the prosecuting attorney and to counsel for the defendant"); but cf. Thomas v. State, 730 So.2d 667 (Fla.1998) (holding that a rule 3.410 violation was not reversible error where defense counsel indicated acceptance of the procedure employed when specifically given an opportunity by the trial court to object).
[12] Prior to commencement of the rescheduled trial, defense counsel filed a motion to dismiss the indictment based upon an alleged improper declaration of mistrial. While acknowledging that he felt uncomfortable making the motion at this point (observing that it should have been brought promptly after the mistrial was declared), Slovis argued that the court did not fulfill its obligation to determine a manifest necessity before declaring a mistrial.
[13] The standard of review in addressing Allen charge issues is "whether, under the totality of the circumstances, the trial judge's actions were coercive," and whether the facts and circumstances surrounding an individual case "combined to create a serious risk of coercion." Id.
[14] In Aldret, this Court held that the State has standing to object to a defendant's discriminatory use of peremptory challenges under both the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and article 1, section 16 of the Florida Constitution. In addressing this question, the Court stated:

Although the issue was not squarely before us, this Court too has specifically addressed this question. In State v. Neil, 457 So.2d 481, 487 (Fla.1984), clarified, State v. Castillo, 486 So.2d 565 (Fla.1986), clarified, State v. Slappy, 522 So.2d 18 (Fla.), cert. denied, 487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988), limited by, Jefferson v. State, 595 So.2d 38 (Fla.1992), we stated:
[People v.] Thompson, [79 A.D.2d 87, 435 N.Y.S.2d 739 (1981)] speaks only of challenges exercised by the prosecution. [People v.] Wheeler, [22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (Cal.1978)] and [Commonwealth v.] Soares, [377 Mass. 461, 387 N.E.2d 499 (Mass.1979)], on the other hand, recognize that the ability to challenge the use of peremptories should be given to the prosecution as well as to the defense. We agree with Wheeler and Soares on this point and hold that both the state and the defense may challenge the allegedly improper use of peremptories. The state, no less than a defendant, is entitled to an impartial jury.
606 So.2d at 1157 (alterations in original).
[15] The exception to the rule has also been discussed in the context of analyzing a judge's actions in failing to explore reasonable alternatives prior to declaring a mistrial. See United States v. Jorn, 400 U.S. 470, 486, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) (concluding that the trial court erred in discharging the jury without first exploring other reasonable alternatives, such as a continuance).
[16] This Court did hold, subsequent to the trial court's action here, that where a jury inquiry falling within the parameters of rule 3.410 is made, it is per se reversible error to address the inquiry without prior notification of counsel. See Thomas, 730 So.2d at 668. However, a harmless error analysis still applies to other contacts between the judge and the jury which fall outside the parameters of rule 3.410. See Mendoza v. State, 700 So.2d 670, 674 (Fla.1997); Bradley v. State, 513 So.2d 112, 113 (Fla.1987); Williams v. State, 488 So.2d 62, 64 (Fla.1986). Further, even as to those communications covered by the rule, the trial court's error in meeting ex parte with the juror "must be invoked by contemporaneous objection at trial." See Thomas, 730 So.2d at 668 ("The per se reversible error rule announced in Ivory [v. State, 351 So.2d 26 (1977)] is prophylactic in nature and must be invoked by contemporaneous objection at trial."). Where, as here, no such contemporaneous objection is made, the trial court's error is waived. See id.
[17] Because the record does not support a finding of bad faith on the judge's part, double jeopardy would not attach. Cf. United States v. Dinitz, 424 U.S. 600, 611, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976) (holding that, "[e]ven accepting the appellate court's conclusion that the trial judge overreacted in expelling [defense counsel] from the court-room," where the appellate court "did not suggest, the respondent has not contended, and the record does not show that the judge's action was motivated by bad faith or undertaken to harass or prejudice the respondent," double jeopardy did not attach); United States v. Jorn, 400 U.S. 470, 487, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) (finding that double jeopardy attached where the trial court precipitously discharged the jury upon concluding that the state's witnessestaxpayers whom the defendant was alleged to have willfully assisted in the preparation of fraudulent tax returnshad not been properly advised of their constitutional rights, and it was "abundantly apparent" from the record that "the trial judge made no effort to exercise a sound discretion to assure that, taking all the circumstances into account, there was a manifest necessity for the sua sponte declaration of this mistrial").
[18] See Sliney v. State, 699 So.2d 662, 672 (Fla.1997) (finding the death penalty proportional with the existence of two aggravators (commission during a robbery and avoid arrest), two statutory mitigators (age and lack of criminal history), and a number of nonstatutory mitigators); Pope v. State, 679 So.2d 710, 712 n. 1, 716 (Fla.1996) (finding the death sentence to be proportionate where aggravators were a previous violent felony and that the murder was committed for pecuniary gain; where the statutory mitigators were extreme mental or emotional disturbance and impaired capacity to appreciate the criminality of his conduct; and where nonstatutory mitigation included intoxication at the time of the offense, the violence occurred subsequent to a boyfriend/girlfriend dispute, and the defendant was under the influence of a mental or emotional disturbance).
[19] In a "special finding" as to the felony murder, the jury found that Oliver "was killed by a person other than Jermaine Lebron," and that Lebron "did not have in his personal possession a firearm" when the murder occurred. The jury also found Lebron guilty of "robbery with a firearm," and made a "special finding" that, during the commission of the robbery, he "did have in his personal possession a firearm."