PER CURIAM.
This case is before the Court on appeal from a resentencing proceeding where Le-brón was sentenced to death. This Court has jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution. For the reasons that follow, we affirm the sentence.
FACTS AND PROCEDURAL HISTORY
Jermaine Lebrón was convicted of the 1995 first-degree murder and robbery with a firearm of Larry Neal Oliver. See Lebron v. State, 799 So.2d 997, 1004 (Fla.2001). In affirming the convictions from the guilt phase, this Court detailed the facts surrounding the murder:
According to eyewitnesses, [Oliver, who worked with one of Lebron’s ac *654 quaintances, Danny Summers,] had been lured to a house in Osceola County (the “Gardenia house”) where Lebrón and several others were staying after Le-brón offered to sell [Oliver] some “spinners” for his truck. Shortly after [Oliver] arrived at the home, Lebrón called to him to come toward the back bedrooms. As [Oliver] entered the hallway leading to the bedrooms, he was forced to lie face down, and was shot at short range in the back of the head.... Money, checks, and a credit card were taken from [Oliver], and stereo equipment was stripped from his truck. Lebrón directed others present at the time to burn [Oliver’s] identification papers, to dispose of [his] body, and to clean up the area where [he] had been shot.
Over the next several days, Lebrón and some of the others used [Oliver’s] credit card, pawned his stereo equipment, and cashed his checks. An attempt was also made to burn [Oliver’s] truck.... Shortly thereafter, Lebrón left for New York City, the place where “Legz Diamond,” a topless juice bar owned by his mother, was located.
[Oliver’s] body was later discovered in a rural area near the Walt Disney World property. Although the body was covered with a blanket and some shrubs, it was still visible from the road.
The medical examiner, Dr. Julia Martin, performed the autopsy on Oliver’s body after it was discovered. She testified that ... [t]here were no bruises to the hands consistent with defensive wounds. The cause of death, which was instantaneous, was from a shotgun wound to the head.
After Lebrón left for New York, the others having knowledge of the event reported the murder to law enforcement officers.... All of the witnesses other than the Tocci brothers gave statements which were consistent throughout, and also consistent with what the police were able to verify with evidence and other statements (such as where the body was hidden; where the truck was burned; how the checks were cashed; and where Oliver’s property was pawned).
At about the same time, a crime-scene investigation was being conducted by the Osceola County Sheriffs Department. Investigators observed several drops of what appeared to be dried blood in a big area at the southeast bedroom door of the home where the event allegedly occurred. They also discovered what appeared to be blood that had some foreign substance on it. The area was at least twelve to fourteen inches in diameter. A very strong stench of dried blood was detected immediately upon entering the residence.
Plastic balls were found inside the southeast bedroom, along with sponges and pellets. A spent Winchester twelve-gauge pheasant shotgun shell was found in a drawer in another bedroom. In a third bedroom, the police found four shotgun shells and the decedent’s ring in a pair of sneakers.
Shortly after these eyewitness reports were made to law enforcement, Lebrón, accompanied at the time by Stacie Kirk and Howard Kendall (who was involved in burning Oliver’s truck), was apprehended in a car parked on the street outside of Legz Diamond, and arrested. Incident to the arrest, a search of the vehicle was conducted, and a day planner was recovered from the center console underneath the dashboard between the passenger seat and the driver’s seat. Upon opening the planner, an identifying card with the name “Larry N. Oliver” was found. Detective Rodriguez retrieved the planner and secured it for *655 safekeeping. He also found four shotgun shells in the center console.
Id. at 1001-02.
Lebron’s first trial resulted in a mistrial due to jury deadlock. See id. at 1001. During the guilt phase of the second trial, the jury found the following on special-verdict forms: (1) Lebrón was guilty of first-degree felony murder; (2) Oliver was killed by someone other than Lebrón; (3) Lebrón did not possess a firearm during the commission of the felony murder; (4) Lebrón was guilty of robbery with a firearm; and (5) Lebrón possessed a firearm during the commission of the robbery. See id. at 1004. During the penalty phase for this same proceeding, the jury recommended the death penalty by a vote of seven to five. See id. at 1006. The trial court sentenced Lebrón to death. See id. at 1008. In 2001, this Court affirmed Le-bron’s convictions but vacated the death sentence and remanded for resentencing. See id. at 1022.[1] After a new penalty phase was held, the jury recommended the death penalty by a vote of seven to five. See Lebron v. State, 894 So.2d 849, 852 (Fla.2005). The trial court sentenced Le-brón to death. See id. In 2005, this Court again vacated the death sentence and remanded for resentencing. See id. at 856.[2]
During the most recent penalty-phase proceeding, which commenced on August 16, 2005, the State presented the testimony of Detective Andrew Lang, who provided a summary of the facts surrounding the incident. Lang testified that Daniel Summers supplied the following information with regard to Lebron’s conduct immediately prior to Oliver’s death: (1) Lebrón was playing with the shotgun in the vehicle on the ride home after Oliver had agreed to follow them; (2) Lebrón stated that he could not believe Oliver was stupid enough to follow them to the house; (3) at the house, Lebrón had the shotgun in his possession when Summers and Oliver walked down the hallway; and (4) Lebrón directed Oliver to lie on the floor, and Oliver eventually complied after an initial struggle. Additionally, Lang testified that the autopsy of Oliver showed no signs of defensive wounds or wounds consistent with a struggle. Lang also testified that Charissa Wilburn provided information that was consistent with Summers’ statement: Wilburn stated that immediately after she heard a struggle in the hallway, she heard a shotgun blast.
Lang also presented evidence that Dwayne Sapp made the following statements with regard to Lebron’s conduct: (1) when Sapp arrived at the house, Le-brón had the gun in his possession; (2) Lebrón directed Sapp to look at “his” (Le-bron’s) truck (the red pickup truck that belonged to Oliver) which had been parked in the garage; (3) Lebrón directed Sapp and the others to clean the area where Oliver had been shot; (4) Lebrón directed that the red pickup truck be destroyed; and (5) Lebrón was present when equipment from Oliver’s truck was pawned and Oliver’s credit card was used. Lang addressed that when Lebrón was arrested in New York, both a shotgun shell and Oliver’s day planner were found in the car *656 used by Lebrón, and, finally that Lebrón had been previously convicted of a robbery and kidnapping and also on a charge of aggravated assault.
The State presented evidence from Oliver’s mother with regard to victim-impact evidence and also exhibits which included (1) proof of Lebron’s prior-violent-felony convictions; (2) pictures of the deceased Oliver after the murder and the hallway at the crime scene; and (3) evaluations of mental health professionals who analyzed Lebrón.
The defense presented only the testimony of Jocelyn Ortiz, Lebron’s mother. Her testimony revealed that while she was living on the streets of New York City, she became pregnant with Lebrón when she was sixteen years old and had used drugs during this pregnancy. Lebron’s father was only involved with Lebrón for the first few months of his life. Her memory of Lebrón during the first few months after his birth was her drug involvement and unsuccessful attempts to feed him. When Lebrón was about three months old, she entered a drug rehab program. Her motivation to enter this residential program was based on being advised that Lebrón would be taken from her if she did not rehabilitate. Lebrón was in foster care during this time.
After completing rehab, she married Tony Ortiz and she worked as a counselor with the rehab program she attended. From the time Lebrón was three months old until he was four or five years old, she did not use drugs. After her job as a counselor there ended, she became a dancer and later a stripper which covered approximately ten years.
During this period of time, Lebrón would steal from her on different occasions. She testified that on occasion she used corporal punishment on Lebrón in an attempt to instill discipline and would tell him to leave her alone when he would “cling” to her. Her employment provided sufficient income to provide for Lebrón, and she would provide him with money and the items (e.g., clothes) he desired.
The defense presented exhibits which included (1) the charges and convictions of the other individuals involved in the Oliver incident; (2) reports with regard to Le-bron’s prior arrest in New York (these reports disclosed that he was seventeen at that time and a codefendant possessed a gun that was used during the crime);[3] and (3) reports with regard to Lebron’s attendance and performance at various schools and group homes during his teenage years.
On August 17, 2005, the jury returned a recommendation of death by a vote of seven to five. The jury found three aggrava-tors on Attachment A[4] and addressed other mitigators on Attachment B.[5]
*657 On September 28, 2005, Lebrón moved for a new trial based upon a letter that allegedly established juror misconduct. Lebrón asserted that the jurors had allegedly discussed that Lebrón had placed a gun to the head of an individual in a separate incident, even though such evidence was never presented to the jury. On October 3, 2005, the trial court conducted a hearing on this issue and multiple jurors were questioned. On October 20, 2005, the trial court denied the motion for a new trial.
On October 20, 2005, the trial court conducted a Spencer[6] hearing. During this hearing, the trial court considered the testimony of Howard Kendall (given during the trial that involved the victim Roger Nasser) that Lebrón was motivated to perpetrate the crime against Nasser[7] because Nasser had attempted to rape Stacie Kirk, who was seventeen at the time. The defense also presented various school records of Lebrón. The defense asserted that the various aggravators should receive limited weight because (1) this Court does not typically give great weight to either the robbery or pecuniary-gain ag-gravator, and here, the robbery also benefited other individuals involved in its commission; (2) when Lebrón committed the crime of attempted robbery in New York, he was a juvenile and an accessory as evidenced by his probation sentence, and the main culprit used a gun that contained blanks; (3) Lebrón was provoked by Brandi Gribben’s threats, which mitigates the aggravated assault that he committed against her;[8] and (4) Lebrón did not possess a firearm when he robbed and kidnapped Nasser, and Nasser had earlier attempted to rape Lebron’s friend, Kirk. Conversely, the State presented a summary of psychological reports and asserted that Lebrón had killed Oliver for no real reason because it was not necessary to murder Oliver to steal his truck.
On December 27, 2005, the trial court sentenced Lebrón to death. The trial court found that the State had proven beyond a reasonable doubt that (1) Lebrón was previously convicted of a felony that involved the use or threat of violence to a person; and (2) the capital felony was committed while Lebrón was engaged in or an accomplice in the commission of robbery (this merged with the financial gain aggravator). The trial court further found that there were no statutory mitigators present. The trial court found the following nonstatutory mitigators: (1) Lebron’s mother used drugs (assigned “very little weight”); (2) Lebrón performed poorly in school (“some weight”); (3) Lebrón was good with children (“very little weight”); (4) the profile of Lebron’s parents was mitigating (“very little weight”); (5) Le-bron’s mother rejected him and had negative feelings about him (“some weight”); (6) Lebrón behaved properly during trial (“very little weight”); and (7) Lebrón had emotional problems, mental health problems, and lacked the “world’s best mother” (“little weight”). Finally, the trial court found that the death sentence was sup *658 ported by an Enmund[9]-Tison[10] analysis because Lebrón was a major participant in the murder of Oliver and Lebrón had demonstrated a reckless disregard for human life. This direct appeal followed.
ANALYSIS
1. Mitigation Findings of Trial Court

Resentencing as a De Novo Proceeding

Lebrón asserts that the trial court erred in its mitigation findings when it considered and relied on evidence not contained in this record. We agree. In the sentencing order, the trial court relied on information, in analyzing multiple miti-gators, that was not introduced (i.e., the trial court neither admitted it as evidence nor took judicial notice of it) during the 2005 penalty-phase proceeding. First, in support of a rejection of the mitigator that Lebron’s participation in the offense was relatively minor, the trial court relied on (1) the testimony of Mark Tocci, Charissa Wilburn, and Danny Summers with regard to the night that Oliver was killed;[11] and (2) Joe Tocci, Mary Lineberger, and Dwayne Sapp “established that the defendant told them [Oliver’s] truck was in the garage” and “also established that the defendant ordered them to clean up the house after the murder and ordered Vern Williams and Dwayne Sapp to dispose of [Oliver’s] body.” Second, in rejecting the mitigation that codefendants received disparate treatment, the trial court stated that “Joe Tocci testified that [Lebrón] said he was going to jack [Oliver] and that he was going to do it for all the guys to see.” Third, in support of a finding that Le-bron’s mother was not a drug addict but instead only a drug user, the trial court relied on testimony which she provided during the 2002 proceeding:
Q When you were only 18, you were a drug addict?
A Well, I used drugs. I wouldn’t call myself a drug addict. I used drugs.
Q And you got into treatment?
A Yes.
Q And the reason you got into treatment was so you wouldn’t lose your son?
A Right.
Q Any other reason?
A When you go into treatment, you go to school. They send you to school. You have a place to live. Those are the reasons. Otherwise, I wouldn’t be able to go to school. I wouldn’t be able to graduate high school or go to college.
Fourth, in support of finding that Lebrón was good with children, the trial court stated that “some evidence that he was good with some children was presented at the previous proceeding.” However, none of this evidence was presented during the *659 2005 proceeding — Mark Tocci, Joe Tocci, Charissa Wilburn, Danny Summers, Dwayne Sapp, and Mary Lineberger did not testify during the 2005 proceeding, and their testimony from a previous proceeding was neither admitted as evidence nor judicially noticed by the trial court.[12]
A trial court’s reliance upon evidence not presented during the most recent penalty-phase proceeding is problematic for multiple reasons. First, this practice is totally inconsistent with the instructions given to the jury and also that which the trial court purported to do in its sentencing order. The jury was instructed during this 2005 proceeding that the advisory sentence should be based upon evidence presented in this proceeding. Thus, the jury’s advisory recommendation was based upon different and less evidence than the trial court utilized in the final determination. The sentencing order itself reflects that the trial court had “closely considered the arguments both in favor of and in opposition to the death penalty, all of the facts and evidence in the trial, penalty proceeding, and Spencer hearing.” (Footnote omitted; emphasis supplied.) Thus, the trial court appeared to correctly recognize that it should not weigh evidence from previous proceedings but, strangely, failed to follow its own maxim.
Second, reliance on evidence not presented during the 2005 proceeding is inconsistent with the premise that a resen-tencing proceeding is de novo and must begin with a “clean slate.” Galindez v. State, 955 So.2d 517, 525 (Fla.2007) (citing Preston v. State, 607 So.2d 404, 408 (Fla.1992); Morton v. State, 789 So.2d 324, 334 (Fla.2001)). In Florida, the State is required to produce evidence during the new sentencing proceeding to establish facts even if those facts were established during the original sentencing proceeding. See Galindez, 955 So.2d at 525. The State is not relieved of its burden of proof during a resentencing proceeding. See Tubwell v. State, 922 So.2d 378, 379 (Fla. 1st DCA 2006) (discussing that “the state was not relieved of its burden to prove the prior offenses” during the resentencing proceeding); Rich v. State, 814 So.2d 1207, 1208 (Fla. 4th DCA 2002) (discussing that evidence being presented during the prior sentencing with regard to the defendant’s qualification for enhanced sentencing was not sufficient to establish that fact during the most recent sentencing proceeding).
Third, if this practice were approved, it would be extremely difficult for this Court to perform its duty of appellate review. The impermissible evidence relied on by the trial court would not be within the record of the proceeding presented to this Court. Although the record may contain earlier transcripts or exhibits from a prior proceeding, trial courts should rely on evidence presented during the most recent penalty-phase proceeding upon which the judgment is based. The best practice is for a trial court to rely on information admitted as evidence during the most recent penalty-phase proceeding. Here, we cannot consider prior penalty-phase evidence not included in the 2005 penalty-phase proceeding to support either mitigation or aggravation findings. Thus, we analyze only evidence from the 2005 penalty-phase proceeding to determine whether the trial court made proper miti *660 gation and aggravation findings in sentencing Lebrón to death.

Evidence from the 2005 Proceeding

In Florida, the finding of a trial court with regard to mitigation will be upheld if there is competent, substantial evidence for such a finding in the record. See Coday v. State, 946 So.2d 988, 1001 (Fla.2006) (quoting Nibert v. State, 574 So.2d 1059, 1062 (Fla.1990)), cert. denied, - U.S. -, 127 S.Ct. 2918, 168 L.Ed.2d 249 (2007). There must be a rational basis for a trial court’s rejection of mitigation. See Coday, 946 So.2d at 988. Additionally, the weight assigned to a mitigating factor is reviewed under an abuse of discretion standard. See id. at 1000-01.
Lebrón asserts that the trial court improperly rejected his age at the time of the crime as a mitigator. In Florida, numerical age alone may not be mitigating if not linked to some other material characteristic (e.g., immaturity). See Echols v. State, 484 So.2d 568, 575 (Fla.1985). For example, evidence that a defendant’s “mental, emotional, or intellectual age was lower than his [or her] chronological age” would support the finding of age as mitigation. Sims v. State, 681 So.2d 1112, 1117 (Fla.1996). Here, the record does not support that at the time of the crime, Lebrón was not functioning as a typical twenty-one-year-old. During the 2005 penalty-phase proceeding, there was some evidence presented that Lebrón functioned at a mental, emotional, and intellectual level below his chronological age, but conversely, there was also contradicting evidence that supported the opposite conclusion. A neuropsychological evaluation described Lebrón as (1) “an extremely engaging youngster”; (2) highly motivated to perform well and attentive; (3) showing no evidence of disordered or delusional thought; (4) having an IQ of ninety-seven, which is in the “average range of intellec-tive ability”; (5) exhibiting “no evidence of a dyslexia or dysgraphia for numbers or spatial disorganization of numbers”; and (6) although slightly behind academically, having everything (e.g., brain functioning) needed to succeed. Unlike the defendant in Mahn v. State, 714 So.2d 391 (Fla.1998), Lebrón lacks factors to link his chronological age to any immaturity. See id. at 400 (“Mahn’s unrefuted, long-term substance abuse, chronic mental and emotional instability, and extreme passivity in the face of unremitting physical and mental abuse provided the essential link between his youthful age and immaturity which should have been considered a mitigating factor in this case.” (emphasis supplied)). Thus, the record provides competent, substantial evidence to support the trial court’s rejection of the age mitigator. Moreover, the record is virtually devoid of any evidence with regard to how Lebrón functioned from the age of eighteen until Oliver’s murder (Le-brón was twenty-one years old at that time). The manner in which Lebrón functioned at the time of Oliver’s murder would have been the most crucial evidence with regard to this age mitigator. The evidence is consistent with a finding that Lebrón could function as a typical twenty-one-year-old.[13]
Lebrón asserts that the trial court abused its discretion when it assigned “very little weight” to its finding that his *661 mother used drugs. This assignment of “very little weight” was based on the trial court’s finding that “there was simply no evidence on what effect the mother’s use of drugs had on the defendant.” This finding by the trial court was supported by competent, substantial evidence; thus, the weight assigned to her drug use was not an abuse of discretion. It is noted that the drug use by Lebron’s mother did impact him. He was placed in foster care at a young age after she entered a treatment program. However, the record does not reveal the nature or extent of any impact her drug use may have had. For example, after the first year of the treatment program, she made monthly trips to visit Lebrón. Additionally, Lebrón was only in foster care when he was very young and returned to live with his mother at the age of four or five after she had completed the treatment program. Additionally, Lebrón appears to have attended schools away from home as a teenager due primarily to his own troubles not related to his mother’s drug use.[14] She agreed to have Lebrón attend these schools in an attempt to rehabilitate him following his delinquent behavior. She had consulted with numerous mental health professionals in an attempt to find help, but his delinquent behavior had continued. Although some psychological evaluations did link some problems to his mother, there was no evidence that these problems were linked to her drug issues. This is consistent with her direct testimony that later in Lebron’s life, when she worked as a dancer and stripper, she only occasionally used marijuana, as compared to her drug use (e.g., cocaine) early in Lebron’s life. Therefore, the trial court did not abuse its discretion when it assigned “very little weight” to her drug use in the analysis.
Lebrón also contends that the trial court improperly rejected the miti-gator that his mother was a drug addict during the pregnancy prior to his birth. However, even if the trial court improperly rejected this mitigator, we conclude that any error would have been harmless. In Florida, even if a mitigator or aggravator finding is erroneous, it is not reversible if the error was harmless beyond a reasonable doubt. See Morris v. State, 811 So.2d 661, 667 (Fla.2002) (holding that any error involving the mitigation findings was harmless beyond a reasonable doubt) (citing Barwick v. State, 660 So.2d 685, 695-96 (Fla.1995)); Hill v. State, 643 So.2d 1071, 1074 (Fla.1994) (holding that any error involving a finding of aggravation is subject to a harmless error analysis, and this Court must determine whether there is a reasonable probability that the mitigation outweighed the remaining aggravators). Here, there is not a reasonable probability that the opposite finding (i.e., Lebron’s mother was a drug addict during her preg *662 nancy with him) would have changed the trial court’s determination that death should be imposed. For the same reasons that Lebron’s mother being a drug user was assigned limited weight, a finding that she was a drug addict would have been assigned “very little weight.” Lebrón presented no evidence of the existence, nature, extent, or effect of his mother’s drug use. There was no link between any emotional or behavioral problems and either drug use or drug addiction during her pregnancy. Instead, the record supports that Lebrón has normal brain function and cognitive capacities. Mental health evaluations indicate that Lebrón tested at an IQ of ninety-seven, which is in the “average range of intellective ability.” The record contains virtually no evidence of Lebron’s level of function from the age of eighteen to when Oliver was murdered. There is no nexus connecting any of this mitigation or the findings with any particular impact on Lebrón. Accordingly, any possible error with regard to the finding of drug addiction would be harmless.
Lebrón also contends that the trial court improperly rejected the difficulties he had in forming relationships as mitigation.[15] Similar to the age-mitigation analysis, the record does contain some evidence that Lebrón did have interpersonal difficulties, but other evidence also exists that Lebrón was able to form meaningful relationships. For example, his mother testified that Lebrón formed an extremely close relationship with Tony Ortiz and was upset when her marriage to him failed. Additionally, mental health professionals described Lebrón as “an extremely engaging youngster” who was “attentive.” Le-brón (at the age of fourteen) was described as “quite popular among peers.” These traits are consistent with an individual who is able to form meaningful relationships. Moreover, a psychological evaluation described Lebrón as “quite friendly, articulate, and cooperative” and indicated that he had formed a sound relationship with his mother, who was present at the interview. Records from an intake meeting when Lebrón attended Pleasantville Cottage School described an affectionate family relationship throughout the interview. This warm relationship was also reflected in school records in answers by Lebrón to a student questionnaire. Thus, in contrast to a lack of relationships, other evidence established that a loving relationship did exist between mother and son. Therefore, the trial court’s rejection of Lebron’s alleged problems in forming interpersonal relationships was supported by competent, substantial evidence during the 2005 proceeding.
Next, Lebrón asserts that the trial court improperly rejected physical abuse as mitigation. The sentencing order relied on the testimony of Lebron’s mother “that she hit him once with a closed fist.” (Emphasis supplied.) Apparently, the trial court did not believe that a one-time incident should be classified as domestic violence abuse. However, Lebron’s mother did not make this direct statement during the 2005 proceeding. Thus, as with the discussion of other mitigation, this aspect must be supported by competent, substantial evidence from the 2005 proceeding. During the 2005 proceeding, Le-bron’s mother testified that she used corporal punishment on occasion and when Lebrón would “cling” to her, she would tell him to leave her alone. She did not testify with regard to how frequent she used this physical discipline. Thus, it is possible *663 that she hit him only once. Further, Le-bron’s mother testified:
Q You had tried disciplining him, right?
A How did I discipline him? I used to yell at him, I used to hit him, because he was, he was — look, I don’t want to be— excuse me.
Q He was what?
A I don’t want to be seen like I was some kind of creep. All mothers hit their kids.
(Emphasis supplied.) In light of this testimony, the trial court reasonably found that the subject conduct was an attempt to discipline Lebrón in a manner similar to her perception of how other mothers discipline their children. This does not necessarily amount to domestic violence or physical abuse. In so holding, we do not conclude that a mother’s perception that physical contact has occurred in the context of discipline necessarily negates the possibility that domestic violence or physical abuse occurred. However, in the instant case, only Lebron’s mother provided evidence on this matter of potential physical abuse. Thus, because the limited information contained in this record does not reflect an alleged severity that could be classified as abuse, we conclude that the trial court’s rejection of physical abuse as mitigation is supported by competent, substantial evidence.
The trial court’s finding that Le-brón was not psychologically abused is also supported by competent, substantial evidence from the record. There is some evidence that Lebron’s mother was psychologically abusive with him, but there is also contrary evidence inconsistent with this conclusion. Some psychological evaluations did link some actions of his mother to some of Lebron’s problems. However, these actions generally involved her sexually promiscuous behavior, which was not intentionally directed toward Lebrón. For example, during one evaluation, Lebrón stated that his mother had acknowledged that she created videos of herself stripping, which was consistent with her employment as a dancer and stripper. Another evaluation report while Lebrón was residing at the Pleasantville Cottage School documented that “[Lebrón] complained ... that she was ‘a whore’ and he complained to his therapist that he once walked in the living room when he was at home on a City trip weekend only to find her having sex with somebody who was not her boyfriend.” This reflects questionable behavior, but there is no evidence that this behavior was in any way intentionally directed toward Lebrón. Moreover, the record contains evidence that there was a loving relationship between Lebrón and his mother. This evidence is consistent with the trial court’s rejection of psychological abuse as mitigation.
Lebrón also contends that the trial court improperly failed to address institutionalization as mitigation and erred in the findings made under the heading “Parent Profile,” wherein the trial court stated that this issue had been addressed. Under the heading “Parent Profile,” the trial court found “that the defendant was in foster homes” but assigned “very little weight” because “there was no evidence presented on what effect, if any, [this] circumstance[ ] had on the defendant.” The record does not establish the existence, nature, or extent of any negative impact on Lebrón by this circumstance. Lebrón entered foster care while his mother received treatment and was only there when he was very young. He returned to live with his mother at age four or five after she completed her treatment. In addition to a lack of evidence, Lebrón was in a more suitable living situation after his mother received treatment for her drug *664 use because she could then provide better care. Thus, on this record, the trial court did not abuse its discretion by assigning “very little weight” to his early placement in foster care. Lebrón also asserts that the trial court improperly failed to address that he was in institutional care from eighth grade until age eighteen. However, as previously discussed, Lebrón appears to have attended schools away from home when he was older due to his own delinquent behavior. There is competent, substantial evidence that supports the trial court’s rejection of this mitigation.[16]
Finally, Lebrón asserts that the trial court erred when it assigned only limited weight to the mitigation findings under the headings “Parent Profile ” and “Psychological.” In assigning weight to these mitigation findings (i.e., Lebron’s mother was a dancer and adult club owner, Lebrón suffered from emotional and mental health problems, etc.), the trial court found that there was no evidence of the effect these circumstances had on Lebrón. We agree. The record contains some evidence of a difficult childhood for Lebrón but also contains other evidence that Le-brón was given opportunities to succeed and had the mental capacity to do so. His mother testified that she provided Lebrón with his material needs and other items that he desired. She continued with financial support after he turned twenty, and she was described as being “affectionate” with Lebrón. Lebrón also had a close relationship with his mother’s former husband, Tony Ortiz. The record supports that Lebrón was given opportunities to succeed as a youngster and that his problems of delinquency in later years were related to his own poor judgment. The record contains virtually no evidence of Lebron’s circumstances from the age of eighteen until the day of Oliver’s murder (when Lebrón was twenty-one), which could have provided a crucial, missing nexus between these mitigation findings and the life of Lebrón before the time of the murder. Thus, the trial court did not abuse its discretion in assigning limited weight to these various mitigation findings.[17]
2. Steele Error
Next, Lebrón asserts that the trial court improperly required the jurors to record a numerical vote for findings with regard to each aggravating and mitigating factor presented. Since our decision in State v. Steele, 921 So.2d 538 (Fla.2006), we have held that any error from the use of special-verdict forms for aggravators is subject to a harmless-error analysis. See *665 Franklin v. State, 965 So.2d 79, 102 (Fla.2007) (“[W]e note that the trial court, at Franklin’s request, gave the jury a special interrogatory verdict form regarding the aggravating factors.... However, in light of Franklin’s request for the special verdict form and the States agreement to its use, the unanimous jury finding as to the four aggravating circumstances, and the jury’s unanimous recommendation of a death sentence, we find no reversible error on this point.” (emphasis supplied)); Rodgers v. State, 948 So.2d 655, 673 (Fla.2006) (“[W]e have found use of special verdict forms to constitute harmless error where, as here, no prejudice is alleged.” (emphasis supplied)) (citing Huggins v. State, 889 So.2d 743, 772 (Fla.2004)), cert. denied, - U.S. -, 128 S.Ct. 59, 169 L.Ed.2d 50 (2007). This conclusion originates from a pre-Steele decision, Huggins. In Huggins, the trial court utilized (over the defendants objection) special-verdict forms on which the jury was to indicate the aggravators and mitigators found and the number of jurors who found each of them to exist. See id. at 772. This Court held that any potential error was harmless because the defendant failed to allege any prejudice from the use of the special-verdict forms. See id.
Here, any error that may have resulted from the jury’s use of special-verdict forms is harmless. Although the instant case is factually distinguishable from Franklin, it is analogous to Rodgers and Huggins because Lebrón has not alleged sufficient prejudice from this alleged error. Lebrón contends that harm was established as evidenced by the trial court’s statement that it wanted to utilize special-verdict forms because it did not like “fishing in the dark.” We disagree. This statement by the trial court was made before the jury was instructed, and it is not an indication of the actual effect the jury’s findings had on the trial court’s sentencing determination. There is no indication that the trial court did not conduct an independent weighing of the aggravating and mitigating factors. Thus, this statement by the trial court does not establish prejudice. Accordingly, we follow prior precedent and hold that any Steele error here is harmless.
3. Ring Error
Additionally, Lebrón asserts that Florida’s capital sentencing scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We disagree. In both Bottoson v. Moore, 833 So.2d 693 (Fla.2002), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.2002), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002), this Court addressed this particular claim and denied relief. See also Jones v. State, 845 So.2d 55, 74 (Fla.2003). Likewise, Lebrón is not entitled to relief. Furthermore, one of the aggravating factors found by the trial court was Lebron’s previous conviction for a violent felony, “a factor which under ... Ring need not be found by the jury.” Jones v. State, 855 So.2d 611, 619 (Fla.2003); see also Doorbal v. State, 837 So.2d 940, 963 (Fla.2003) (rejecting the Ring claim where one of the aggravating factors found by the trial court was the defendant’s prior conviction for a violent felony), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003). For all of these reasons, we deny relief on this claim.[18]
*666 4.Constitutionality of the Standard Penalty-Phase Jury Instructions
Lebrón also asserts that Florida’s standard penalty-phase jury instructions are unconstitutional. We disagree. This Court has repeatedly rejected the claim that these instructions improperly shift the burden of proof to the defendant. See, e.g., Rodriguez v. State, 919 So.2d 1252, 1280 (Fla.2005); Sweet v. Moore, 822 So.2d 1269, 1274 (Fla.2002); Carroll v. State, 815 So.2d 601, 622-23 (Fla.2002); San Martin v. State, 705 So.2d 1337, 1350 (Fla.1997). Additionally, this Court has repeatedly rejected the claim that these instructions denigrate the jury’s role in capital sentencing proceedings (or a similar claim of this nature) in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). See, e.g., Perez v. State, 919 So.2d 347, 368 (Fla.2005); Globe v. State, 877 So.2d 663, 674 (Fla.2004); Thomas v. State, 838 So.2d 535, 542 (Fla.2003); Brown v. State, 721 So.2d 274, 283 (Fla.1998). Lebrón does not provide a valid reason to deviate from this precedent.
5.Constitutionality of Lethal Injection
Lebrón also asserts that execution by lethal injection, as currently performed in Florida, constitutes cruel and unusual punishment in violation of the United States Constitution. We disagree. This Court has recently considered this claim in other cases and denied relief. See Schwab v. State, 969 So.2d 318, 325 (Fla.2007) (“Given the record in Lightbourne and our extensive analysis in our opinion in Lightbourne v. McCollum, we reject the conclu-sión that lethal injection as applied in Florida is unconstitutional.”); Lightbourne v. McCollum, 969 So.2d 326, 353 (Fla.2007) (“Lightboume has failed to show that Florida’s current lethal injection procedures, as actually administered through the DOC, are constitutionally defective .... ”), petition for cert. filed, No. 07-10265 (U.S. Apr. 3, 2008). Likewise, Le-brón is not entitled to relief on this claim.
6.Proportionality of Death Sentence

Introduction

Finally, Lebrón asserts that the imposition of the death sentence here is disproportionate. We disagree. During the 2005 proceeding, the jury recommended the death penalty by a vote of seven to five. The trial court found this recommendation appropriate after weighing the ag-gravators and mitigators. The trial court found two aggravators to be proven beyond a reasonable doubt: (1) Lebrón had previously been convicted of a felony that involved the use or threat of violence; and (2) Lebrón committed the capital felony while he was engaged, or was an accomplice, in the commission of the crime of robbery. The trial court did not assign these aggravators a particular weight; rather, these factors were found to be “present.” The trial court also found the following nonstatutory mitigators: (1) Le-bron’s mother used drugs (“very little weight”); (2) Lebrón performed poorly in school (“some weight”); (3) Lebrón was good with children (“very little weight”); (4) the profile of Lebron’s parents was mitigating (“very little weight”); (5) Le- *667 bron’s mother rejected him and had negative feelings about him (“some weight”); (6) Lebrón behaved properly during trial (“very little weight”); and (7) Lebrón had emotional problems, mental health problems, and lacked the “world’s best mother” (“little weight”).

Strength of Aggravators

Here, notwithstanding that weights were not assigned, the two aggra-vators found by the trial court merit at least moderate weight. For the prior-violent-felony aggravator, the trial court relied on three prior violent felonies of Le-brón in support of its finding that the aggravating factor was present. The record contains competent, substantial evidence (i.e., a sentence and judgment) for each of the three convictions. The aggravated assault that involved the victim Grib-ben was committed only a few days before Oliver’s murder and Lebrón did possess a firearm during this aggravated assault. The same gun used in the murder of Oliver was also used in the incident that involved Gribben. Moreover, the robbery and kidnapping conviction that involved the victim Nasser was committed approximately one week after Oliver’s murder. Thus, the fact that Lebrón was convicted of attempted robbery in New York, in addition to the other two convictions occurring close in time and Lebrón using a gun for at least one of these convictions, support that this prior-violent-felony aggravator merits at least moderate weight.
Evidence from the 2005 penalty proceeding provides strong support for the trial court’s finding of the second ag-gravator (i.e., the murder was committed while Lebrón was engaged, or was an accomplice, in the commission of the crime of robbery).[19] During the 2005 penalty proceeding, Detective Lang testified that Danny Summers provided him with information that included: (1) Oliver agreed to follow the group back to the house after Lebrón advised Oliver that he possessed some “spinners” for sale; (2) during the *668 ride back to the house, Lebrón was playing with the shotgun and stated that he would “jack” Oliver, which Summers interpreted to mean that Lebrón would rob Oliver, and Lebrón also stated that he “couldn’t believe [Oliver] was so stupid to follow [them] to the house”; (3) once they reached the house, Lebrón directed Wilburn to bring the shotgun into the house and she complied; (4) at the house, Lebrón called out to Summers, and Summers and Oliver then walked down the hall toward Lebrón; (5) while they walked down the hall, Lebrón came out of a bedroom with the shotgun in hand; (6) Lebrón pointed the gun at Oliver and ordered him to lie on the floor; and (7) Oliver eventually obeyed Lebron’s order after he initially struggled.
Detective Lang testified that Wilburn provided him with information that matched the information provided by Summers: immediately after Wilburn heard a struggle between Lebrón and Oliver, she heard a shotgun blast. Dwayne Sapp provided information that was consistent with the information provided by both Summers and Wilburn: (1) when Sapp arrived at the house after Oliver was dead, Lebrón had the gun in hand; and (2) Lebrón directed Sapp to look in the garage at his (Le-bron’s) truck (which- had previously belonged to Oliver). Finally, Lang testified that when Lebrón was arrested in New York following Oliver’s murder, a shotgun shell and day planner, which belonged to Oliver (and in which Lebrón had written), viere found in the car driven by Lebrón. Thus, this extensive testimony established that Lebrón robbed Oliver during the commission of this capital-felony offense, and this aggravator also merits at least moderate weight.

Comparison to Other Capital Cases

When this Court conducts a proportionality review, the totality of the circumstances must be considered and the entire matter is compared with other capital cases. See Nelson v. State, 748 So.2d 237, 246 (Fla.1999). This comparison is not simply a calculation of the number of aggravators and mitigators. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). Additionally, the death penalty is imposed “for only the most aggravated and least mitigated of first-degree murders.” Urbin v. State, 714 So.2d 411, 416 (Fla.1998). After reviewing the totality of the circumstances, the instant case is comparable to other cases in which this Court has upheld the death penalty. Notwithstanding that neither the heinous, atrocious or cruel (HAC) nor the cold, calculated and premeditated aggravator was found,[20] both the strength of the aggravation findings and the little value provided by the mitigation findings warrants a death sentence.
The death sentence has been imposed in other cases that have had similar aggrava-tors and stronger mitigation than the present case. In Melton v. State, 638 So.2d 927 (Fla.1994), this Court held the death sentence to be proportionate for a murder committed during a robbery where the trial court found two aggravating factors (i.e., prior violent felony and committed for financial gain) and two nonstatutory mitigating factors (i.e., Melton’s good conduct while awaiting trial, and his difficult family background). See id. at 929. In Freeman v. State, 563 So.2d 73 (Fla.1990), cert. denied, 501 U.S. 1259, 111 S.Ct. 2910, 115 L.Ed.2d 1073 (1991), this Court held that the death sentence was proportionate for a murder committed during a burglary where the trial court found two aggrava *669 ting factors (i.e., prior violent felony and committed for financial gain and murder occurred while Freeman was committing a burglary (merged)) along with four non-statutory mitigating factors (i.e., Freeman was of low intelligence, he was abused by his stepfather, he possessed some artistic ability, and he enjoyed playing with children). See id. at 75. In declining to find the death sentence to be disproportionate, this Court concluded that the “nonstatuto-ry mitigating circumstances were not compelling.” Id. at 77 (emphasis supplied).
In Miller v. State, 770 So.2d 1144 (Fla.2000), we held the death sentence to be proportionate for a murder committed during an attempted robbery where the trial court found two aggravating factors (i.e., prior violent felony and homicide was committed during an attempted robbery and for pecuniary gain (merged)) and ten nonstatutory mitigating factors (i.e., victim did not suffer, the alternative sentence was life without possible release, Miller turned himself in, he showed remorse and apologized to the victim’s family, Miller cooperated with the police, he suffered emotional distress over the death of his sister and a close cousin, Miller had a frontal lobe defect that affected inhibition and the ability to control impulses, he would likely do well in long-term incarceration, he was loved by his family and performed good deeds, and Miller had adjusted well while incarcerated). See id. at 1146 n. 1. Like Melton, Freeman, and Miller, in which similar aggravators were found, the trial court in the present case found nonstatuto-ry mitigators that were not compelling. In Melton and Freeman, this Court upheld the death sentence despite both defendants having difficult family backgrounds. Likewise, Lebron’s family background does not constitute mitigation that compels a different sentence. Unlike Miller, the record here does not support that Lebrón suffered from any brain defect, and the totality of the circumstances here does not require a sentence other than death.
Moreover, the cases upon which Lebrón relies in asserting that his death sentence is disproportionate are distinguishable. In Robertson v. State, 699 So.2d 1343 (Fla.1997), this Court held that a death sentence was disproportionate where the trial court found two aggravators (i.e., HAC and committed during the course of a burglary) and five mitigators (i.e., Robertson’s age of nineteen, his abusive and deprived childhood, his history of mental illness, his borderline functional intelligence, and his impaired capacity at the time of the murder due to drug and alcohol use). See id. at 1345. This Court reasoned that notwithstanding the trial court assigning only “little weight” to the mitigation, a death sentence was disproportionate due to the “substantial mitigation.” Id. at 1345, 1347. Unlike Robertson, the mitigation in the instant case is not substantial. As previously described, Lebron’s age was not a mitigating circumstance, he did not have below-average intellectual ability, and he did not assert that he was impaired by drugs or alcohol when Oliver was murdered. Additionally, although there is some evidence that Lebron’s mother may have used corporal punishment, there is other evidence that established she was caring and “affectionate.” Thus, the mitigation found by the trial court was of minimal value, while the aggravators were established by extensive, clear, and overwhelming evidence presented during the 2005 proceeding.
In Livingston v. State, 565 So.2d 1288 (Fla.1988), this Court held that a death sentence was disproportionate where the trial court found three aggravators (i.e., prior violent felony, committed during armed robbery, and committed to avoid or prevent arrest) and two mitigators (i.e., Livingston’s age of seventeen and his “un *670 fortunate home life and rearing”). Id. at 1292. This Court explained that Livingston suffered “severe beatings by his mother’s boyfriend who took great pleasure in abusing him while his mother neglected him” and his intellectual functioning after these beatings was “marginal” at best. Id. (emphasis supplied). Additionally, there was evidence that Livingston extensively used cocaine and marijuana. See id. This mitigation is much more substantial than the mitigation established here. Unlike Livingston, the record does not establish that the physical violence toward Lebrón was severe; Lebron’s mother explained the conduct that existed in the context of “discipline.” Additionally, as previously described, the trial court properly rejected age as mitigation in the instant case, and there was clear evidence that Lebrón had the intellectual capacity to succeed academically. This case does not involve extensive drug use and is clearly distinguishable from Livingston.
In Urbin, this Court held a death sentence to be disproportionate where the trial court found three aggravators (i.e., prior violent felony, committed for purpose of preventing lawful arrest, and committed during commission of robbery and for pecuniary gain (merged)), and six mitigators (i.e., Urbin’s age at the time of the crime, his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired, absence of his father, drug and alcohol abuse, the imprisonment of his mother, his dyslexia, and his employment history). See 714 So.2d at 415 n. 2. This Court reasoned that Urbin’s age and the fact that “Urbin’s capacity to appreciate the criminality of his conduct was substantially impaired” were weighty mitigators. Id. at 417-18. Unlike Urbin, the trial court in the instant case did not find these two statutory mitigators. Thus, the imposition of the death sentence in the instant case is not disproportionate when compared to Urbin.
Accordingly, we conclude that Lebron’s death sentence is proportionate to other capital cases in which a death sentence has been imposed.
CONCLUSION
For the reasons expressed above, we affirm Lebron’s sentence of death.
It is so ordered.
LEWIS, C.J., and PARIENTE, QUINCE, CANTERO, and BELL, JJ„ concur.
PARIENTE, J., concurs with an opinion.
ANSTEAD, J., concurs in result only.
WELLS, J., recused.

. This Court vacated Lebron’s death sentence due to the following: (1) the trial court erred in finding the felony-probation aggravator because this violated the ex post facto doctrine; and (2) the trial court erred in rejecting the minor-participant mitigator based on the trial court’s improper finding that Lebrón shot Oliver, which was contrary to the special finding of the jury that someone other than Lebrón shot Oliver. See id. at 1020-21.

. This Court vacated Lebron’s death sentence because the probative value of the evidence presented to establish the prior-violent-felony aggravator was far outweighed by its prejudicial effect. See id. at 853.

. On February 18, 1993, Lebrón was convicted of attempted robbery for this crime, which was committed in New York.

. The trial court required the jurors to record a numerical vote for each aggravator on a document called “Attachment A.” The jury found the following aggravation: (1) Lebrón had a conviction for a prior violent felony (the jury vote was twelve to zero); (2) the felony murder of Oliver was committed while Le-brón was engaged in a robbery (twelve to zero); and (3) the felony murder of Oliver was committed for financial gain (nine to three).

. The trial court also required the jurors to record a numerical vote for each mitigator on a document called "Attachment B.” The jury found the following with regard to mitigation: (1) Lebrón was not merely an accomplice, whose participation was relatively minor, in the felony murder of Oliver (twelve to zero); (2) Lebron’s age was not a mitigator (twelve to zero); (3) no aspect of Lebron's character, record, or background was a mitigator (nine to three); and (4) no other circumstance of *657 the felony murder was a mitigator (twelve to zero).

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. On June 24, 1997, Lebrón was convicted of both robbing and kidnapping Nasser. This incident occurred approximately one week after Oliver's murder.

. On August 26, 1997, Lebrón was convicted of perpetrating an aggravated assault with a firearm against Gribben. This incident occurred only a few days before Oliver’s murder.

. Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

. Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

. The trial court’s sentencing order contained the following:
The evidence presented in this case established through the testimony of Mark Tocci, Charissa Wilburn, and Danny Summers that:
1.The defendant said he was going to "jack” the victim, Larry Neal Oliver, Jr., and that the term "jack” meant to rob;
2. The defendant asked [Oliver] to follow them to the house on Gardenia Road;
3. The defendant had possession of a shotgun, which he gave to Charissa Wilburn to take into the house;
4. The defendant got the shotgun from Charissa Wilburn after she took it into the house;
5. After the shotgun blast, the defendant told Charissa Wilburn, who was in another room, that it was over and that [Oliver] was dead; and
6. The defendant was observed going through [Oliver’s] property, taking money, checks and credit cards.

. The trial court mentioned additional information that was not presented during the 2005 proceeding, but the trial court attributed this information to Lebron's mother, who testified during the 2005 proceeding. It is ¡in-possible to determine whether the trial court misinterpreted her testimony from the 2005 proceeding or, instead, improperly relied on testimony from an earlier proceeding.

. Contrary to Lebron’s assertion, the fact that he attempted to forge a school transcript on the night of Oliver’s murder does not establish that he was performing poorly in school at that time. The record only establishes that Lebrón attempted this forgery because his mother would send him money for his purported school expenses. The record does not establish that Lebrón was even enrolled in school; thus, it cannot be implied that he was performing poorly in school.

. The record reveals Lebron’s placement as a teenager in various schools and group homes: (1) after Lebron’s mother had him evaluated by multiple mental health professionals, she agreed to have him attend, in July 1988, the Pleasantville Cottage School, which was a facility located in Pleasantville, New York; (2) Lebron's mother agreed to this placement because Lebrón stole items (i.e., money, and jewelry) from her, would not attend school, and had emotional problems; (3) Lebrón remained at the Pleasantville Cottage School until June 18, 1990, at which time he transferred to Glen Mills, which was a military-type school located in Concordville, Pennsylvania, that provided a more structured environment; (4) Lebrón left Glen Mills on April 1, 1991; (5) Lebrón attended the Lutheran Community Services Group Home on August 9, 1991; (6) within a week of his arrival, he was asked to leave because he "stole in the community"; (7) the Jewish Child Care Association then made attempts to find other accommodations, but these attempts failed primarily due to his delinquent behavior and age; and (8) when Lebrón became eighteen years old, no other educational opportunities were attempted.

. The specific finding of the trial court was: “There was no evidence presented that supports the notion that the defendant had an exaggerated need for approval, was easily led by others, or that he had shallow emotional attachments.”

. Lebrón also contends that contrary to the findings in the trial court's sentencing order, there was no evidence that he “was cared for by extended family at times” or that his mother only "traveled somewhat.” Specifically, Lebrón asserts that his mother traveled extensively during which time he would be left with inadequate care. However, during the 2005 proceeding, Lebron's mother only testified that she would take trips for her job as a dancer and stripper; she did not testify with regard to the frequency of these trips. Thus, the trial court’s finding that she "traveled somewhat” is supported by the record. It should be noted that Lebrón is correct that there is no evidence in the record that extended family cared for him. However, the fact that Lebrón was cared for by people other than extended family when Jocelyn traveled does not necessarily mean this care was inadequate.

. Lebrón contends that Crook v. State, 813 So.2d 68 (Fla.2002), supports his assertion that the trial court improperly assigned limited weight to these various mitigation findings. In Crook, this Court, in holding that the case should be remanded for the trial court to make a new sentencing determination, did not address the "moderate weight” that was given to the various parental-profile and home-life mitigators. See id. at 78. Thus, Crook is unpersuasive on this issue.

. Lebrón also asserts that his death sentence is unconstitutional because the jury’s recommendation was not unanimous. We disagree. This Court has consistently held that it is not unconstitutional for a jury to recommend a death sentence on a simple majority vote. See, e.g., Coday, 946 So.2d 988; Whitfield v. State, 706 So.2d 1 (Fla.1997); Thompson v. *666 State, 648 So.2d 692 (Fla.1994); Brown v. State, 565 So.2d 304 (Fla.1990); Alvord v. State, 322 So.2d 533 (Fla.1975).
Additionally, Lebrón asserts that the existence of the prior-violent-felony aggravator should not render Ring inapplicable. Notwithstanding this assertion, we follow our pri- or precedent that rejects this Ring claim due to both the existence of the prior-violent-felony aggravator, see Jones, 855 So.2d at 619; see also Doorbal, 837 So.2d at 963, and other independent grounds. See Bottoson, 833 So.2d 693; King, 831 So.2d 143.

. In the portion of its sentencing order addressing this aggravator, the trial court only referenced information that was not presented during the 2005 proceeding. The trial court only referenced the testimony of Mark Tocci, Charissa Wilburn, Danny Summers, Dwayne Sapp, and Joe Tocci as the evidence establishing that this particular aggravator was "present.” However, none of these individuals testified during the 2005 proceeding. The only individuals who testified in 2005 were Detective Lang, Rebecca Oliver, and Le-bron's mother. Detective Lang did provide hearsay testimony when he paraphrased from Danny. Summers, Charissa Wilburn, and Dwayne Sapp, but he never addressed the statements of Mark Tocci or Joe Tocci. Strangely, even the trial court acknowledged this fact:
Mr. Ashton: At no time did I ask this witness to quote anything Mark Tocci ever said. I asked him to quote Danny Summers, I asked him to quote Charissa Wilburn, and I asked him to quote [Dwayne] Sapp, no one else. Mark Tocci’s credibility is not before this jury.
The Court: Just a second. (Reading real-time translation) Objection is sustained. He’s right.
(Emphasis supplied.) Additionally, neither the State nor Lebrón used testimony from past proceedings as exhibits. Thus, this testimony relied upon by the trial court in its sentencing order is not within the record of the proceeding now on appeal. Moreover, the trial court provided no reference to establish the proceeding during which this alleged testimony occurred. Similar to the above analysis for the claim that mitigation findings constituted error, evidence from the 2005 penalty proceeding may be analyzed to support this aggravator finding in this proportionality analysis. See generally Johnson v. State, 969 So.2d 938, 957 (Fla.2007) ("When a defendant asserts that the evidence is insufficient to support an aggravator, this Court reviews the record to determine ... whether competent, substantial evidence supports [the trial court’s] finding.” (citing Willacy v. State, 696 So.2d 693, 695 (Fla.1997))), cert. denied, No. 07-9402, - U.S. -, 128 S.Ct. 2056, 170 L.Ed.2d 799 (2008).

. See Buzia v. State, 926 So.2d 1203, 1216 (Fla.2006) ("We have held that both the HAC and CCP aggravators are 'two of the most serious aggravators set out in the statutory sentencing scheme.’ ”) (quoting Larkins v. State, 739 So.2d 90, 95 (Fla.1999)).